*Decisions will be entered under Rule 155.*

INDEPENDENT COOPERATIVE MILK PRODUCERS ASSOCIATION, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10791–78.     Filed June 15, 1981.

*David M. Rosenberger*, for the petitioner.
*Beth L. Williams*, for the respondent.

HALL, *Judge*: Respondent determined deficiencies in petitioner's income tax of $10,622.26 for 1973 and $19,895.35 for 1974. The issue for decision is whether allocations of patronage dividends to certain of petitioner's members constituted "qualified written notices of allocation" as defined by section 1388(c).[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time it filed its petition, petitioner had its principal place of business in Grand Rapids, Mich. Petitioner filed its tax returns on the calendar year basis.

Petitioner is a farmers' cooperative, incorporated in 1950 as a nonstock corporation under the laws of the State of Michigan. Petitioner's corporate purpose is to engage in collective sales of milk or milk products for its members and to act as bargaining agent for the membership in the sale and distribution of these products. During 1973 and 1974, petitioner qualified as an exempt farmers' cooperative under section 521.[2]

All of petitioner's members are dairy farmers. If a nonmember dairy farmer inquires about membership, petitioner dispatches a field representative to his farm. The field representative's visit serves a twofold purpose, to inspect the farm for quality control and to explain to the farmer how the cooperative works. After the field representative gives his approval, the prospective member signs a membership agreement in duplicate.

Both copies of the signed membership agreement are returned to petitioner's office pending approval by the board of directors.

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

[2] During 1973 and 1974, petitioner marketed only milk of its member-farmers. In 1973, there were 488 members, and in 1974, there were 514 members.

Upon approval, one copy of the membership agreement is retained by petitioner and the other copy is delivered to the new member. In addition to the membership agreement, each new member receives a welcome letter[3] and information relating to medical insurance.

In general, the membership agreement obligates each member to deliver all of his milk to petitioner for subsequent sale. In return, petitioner agrees to sell the milk and to distribute the sales proceeds (minus commissions, shipping costs, and other miscellaneous deductions) to each member on a monthly basis. The commission fees deducted by petitioner are used for salaries and other operating expenses of the cooperative. Furthermore, paragraph 6 of the membership agreement specifically provides:

6. THIS AGREEMENT is one of a series alike in terms, comprising with all such agreements signed by individual producers or otherwise, one single contract between the Association and the said producers mutually and individually obligated under all terms thereof and the signing of this contract shall be considered the signing of an application for membership in the Association and an agreement to abide by all rules and regulations thereof. The violation of this agreement by the producer shall be considered full and sufficient cause for the cancellation of the producers membership in the Association.

During 1973 and 1974, article 29 of petitioner's bylaws read, in pertinent part, as follows:

Section 1. In the marketing of agricultural and dairy products of its members and other producers, the corporation shall turn back to such members and other producers the proceeds of sales, less the necessary marketing expenses on the basis of the products marketed. In the purchasing and distribution of supplies and equipment, and in the rendition of services to its members and other patrons the corporation shall turn over such supplies and equipment, and render such services at cost, plus necessary expenses.

In order to operate on a non-profit and co-operative basis as aforesaid, and at the same time to insure the solvency and financial stability of the corporation, the charges, receipts and revenues of the corporation, and the expenditure, disbursements and distribution thereof, shall be handled and conducted in the manner set forth in the succeeding sections of this article.

*       *       *       *       *       *       *

Section 3. In Order to furnish funds to guarantee payment (to the extent

---

[3]The welcome letter contains the following message:

"We urge you to cooperate as far as possible with YOUR fieldman and haulers in furnishing us with a clean, even flow of milk throughout the year.

"I am enclosing a copy of your contract for your records. Only by cooperation and fulfillment by all parties can the best milk market be maintained."

such funds being available) for products sold to other purchasers, such funds being in addition to reinvestments by patrons of patronage funds, the board of Directors are authorized to retain from the proceeds due patrons from the sale of such products, made to or negotiated through the corporation, such amount per hundred weight of products marketed by such patrons as may be authorized by the members at each annual meeting. Such amounts withheld from said proceeds, and not used to guarantee said payments within the same fiscal year to patrons making same, shall be allocated to patrons as retains, subject to redem[p]tion by the board of directors on such plan as it may adopt.

Section 4. The net annual margins, savings or earnings from the transaction of the business of the corporation shall be apportioned to and distributed among all the patrons as a cooperative dividend for the respective year in proportion to the patron's respective volume of milk marketed through the corporation, as the same appears upon the books and records of the corporation. Said cooperative dividend shall be paid or credited to the account of the patrons entitled thereto at least once each year.

Section 5. The board of directors is authorized to pay patronage dividends to the patrons in cash or by allocation on the books of the corporation with due notice to be given to the patron receiving such allocations; provided, however, that in the payment of patronage dividends, all patrons shall be treated alike, and there shall be no discriminatory treatment between member and nonmember patrons.

\*     \*     \*     \*     \*     \*     \*

Section 7. Each person who hereafter applies for and is accepted to membership in this cooperative, and each member of this corporation on the effective date of this bylaw, who continues as a member after such date shall, by such act alone, consent that the amount of distribution with respect to his patronage occurring on or after October 1, 1963, which are made on written notices of allocation (as defined in 26 USC 1388), and which are received by him from the cooperative, will be taken into account by him at their stated dollar amounts in the manner provided in 26 USC 1385(a) in the taxable year in which such written notices of allocation were received by him.

Section 8. Each person who hereafter applies for and is accepted to membership on [sic] this cooperative on or after February 28, 1967 and each person who continues as a member after such date, shall by such act alone, consent to treat all certificates based on retains made by this cooperative from payments made for products sold by member through this cooperative, issued to member as qualified per unit retain certificates, as income at their stated dollar amount in the taxable year in which such certificates are received by members required by 26 [U.S.C.] 1385(a), as amended.

Sections 7 and 8 of article 29 reflect amendments adopted by petitioner's membership in March 1966 and March 1967.[4] Peti-

---

[4]Petitioner did not distribute copies of sec. 7 of art. 29 to members who joined the cooperative after 1967.

tioner's members were notified of the 1967 bylaw changes by means of a newsletter distributed in 1967.

In accordance with its bylaws, petitioner allocates its net annual earnings to its members based on the weight of milk sold for each member during the year. These allocations of net earnings will hereinafter be referred to as "patronage dividends."[5] Pursuant to article 29, section 5, petitioner opted to pay 20 percent of the 1973 and 1974 patronage dividends by check. Petitioner retained the remaining 80 percent of the net earnings in each year and issued certificates of equity to each member for his allocable portion of the retained amounts.[6] Members receive cash for their certificates of equity when petitioner redeems the certificates; the redemption date is determined by petitioner's board of directors. It has been petitioner's practice to redeem certificates of equity at face value in the ninth year after the year to which they relate.

The chart below reflects petitioner's 1973 and 1974 patronage allocations:

| Year | Net earnings | Cash allocations (20%) | Certificates of equity (80%) |
|------|--------------|------------------------|------------------------------|
| 1973 | $109,624.80 | $22,066.41 | $87,558.39 |
| 1974 | 136,163.26 | 27,422.06 | 108,741.20 |

Pursuant to the bylaws, petitioner's membership votes annually to withhold a certain amount of sales proceeds for the Producers Guarantee Payment Fund. The fund's purpose is to protect the members from defaults by milk purchasers. The amounts withheld are referred to as "retains." Each member is credited on petitioner's books for the retains withheld from his sales proceeds. On an annual basis petitioner issues to each member a certificate of retains which reflects the members' contribution to the fund for that year.[7] Members receive cash for

---

[5]These allocations qualify as patronage dividends under sec. 1388(a). See note 11 *infra*.

[6]As used in sec. 7 of art. 29, the term "written notice of allocation" refers to these certificates of equity. Printed on the face of each certificate of equity is the following legend:

"This is to certify that the above named member has left on deposit with the Association the Allocated Credit of the Capital Retains for the fiscal year ended * * * which was not distributed in the form of cash. The amount (as shown above) has been credited on the books to your account.

"This Certificate is redeemable only in accordance with the by-laws of the Association."

[7]Printed on each certificate of retains is the following language:

"This is to certify that the above named member has left on deposit with the Association the

their certificates of retains when petitioner redeems these certificates. The redemption date is determined by petitioner's board of directors. It has been petitioner's practice to redeem certificates of retains at their face value in the fifth year after the year to which they relate.

In 1973 and 1974, petitioner's membership voted to withhold as retains 1½ cents per hundred weight of milk sold. Petitioner's total withholdings equaled $37,024.05 for 1973 and $42,009.43 for 1974.

On the first business day of September 1974, petitioner mailed to each member a packet of documents and forms relating to its 1973 taxable year. Each packet contained (1) a certificate of retains, (2) a check for 20 percent of the member's 1973 patronage dividend, (3) an invoice attached to the check, (4) a certificate of equity representing the remaining 80 percent of the member's 1973 patronage dividend, and (5) a Form 1099-PATR, Statement for Recipients (Patrons) of Taxable Distributions Received from Cooperatives.[8] The check issued to each member was an ordinary bank check, containing no information other than the drawer, drawee, payee, amount, date, and account to be charged. The invoice attached to this check contained the following printed information:

PLEASE HELP US TO HELP YOU, CASH THIS CHECK
IMMEDIATELY

INVOICE DATE                                                        DATE
                                                                   AMOUNT

---

Allocated Credit of the Net Retained Producer Guarantee Payment Fund for the fiscal year ended * * *. The amount (as shown above) has been credited on the books to your account.

"This Certificate is redeemable only in accordance with the by-laws of the Association.

"The Internal Revenue Code implies that it is not necessary to pay any cash with respect to the written notice of allocation of Retained Producer Guarantee Payment Funds. However, the member will be obligated to include the entire amount of ALL Retained Funds and Cash Distributions in his gross income for income tax purposes."

[8]The 1099-PATR forms received by the membership contained the following statements:

(1) "Statement for Recipients (Patrons) of TAXABLE DISTRIBUTIONS RECEIVED FROM COOPERATIVES 1974; and

(2) "The amounts shown on this form are taxable payments only. Other payments that are not taxable need not be reported."

In filling out Form 1099-PATR for each member, petitioner aggregated the following amounts and placed the total in the box entitled "Patronage Dividend":

(i)     The amount on the member's certificate of retains;

(ii)    The amount on the member's certificate of equity; and

(iii)   The amount of the member's check from petitioner.

SUMMARY: 1973 OPERATING YEAR:
FORM 1099 IS THE TOTAL OF ALL BELOW DECLARED DOCU-
MENTS.
ALLOCATIONS: CERTIFICATE OF RETAINS (PGPF)
CERTIFICATE OF EQUITY (80%)
DISTRIBUTION: 20% OF EQUITY IS CASH

INDEPENDENT COOPERATIVE MILK PRODUCERS ASSOCIA-
TION, INC., 1221 McREYNOLDS, N.W., GRAND RAPIDS, MICHI-
GAN, 49504, PH. 459-9573

In September 1975, petitioner mailed a packet of documents and forms to each member reflecting the cooperative's 1974 taxable year. The documents and forms were identical to those mailed to the members in 1974 except for the dates and amounts appearing on the various items.[9]

All checks issued by petitioner for 1973 and 1974 patronage dividends were endorsed by its members. The endorsements did not contain any written terms by which the endorser consented to include noncash patronage dividends in income.

Petitioner generally publishes a monthly newsletter which it distributes to its members with the monthly milk checks. The September 13, 1973, edition of the newsletter contained the following item:

*1972 Distributing*—You recently received your certificate on the reported income statement of 1972, which was the Guarantee of Pay Fund—$35,597.72, and Producers Equity—$54,218.06. Each year on September 1st, our office mails you your allocated amount in the form of certificates. Guarantee of Pay Fund (yellow paper) = 100%. Producers equity (white paper) = 80% and a check for 20%. (The Internal Revenue Service ruled several years ago that 20% of Producers equity had to be paid in cash to help you meet your income tax obligation). We encourage you to use the forms 1099 PATR when declaring your 1973 Income Tax return. Then when these monies are paid you, the tax will have been paid.

Petitioner's taxable income, excluding adjustments for patronage dividends under section 1382, was $109,624.80 in 1973 and $136,163.26 in 1974. Petitioner claimed deductions for patronage dividends in each year equal to the above amounts thereby reporting no taxable income for either 1973 or 1974. In his statutory notice, respondent disallowed $35,671.38 of the 1973 patronage dividend deductions and $54,990.33 of the 1974

---

[9]Petitioner also followed the same procedure for its 1972 and 1973 mailings.

patronage dividend deductions. These amounts reflect the noncash patronage dividends allocated to members who joined petitioner after 1967.

OPINION

The issue for decision is whether petitioner's allocations of patronage dividends to certain of its members are "qualified written notices of allocation" as defined by section 1388(c).

Despite their status as exempt organizations, exempt farmers' cooperatives, like petitioner, are subject to tax. Secs. 521(a), 1381(a)(1), and 1381(b).[10] The extent to which these organizations are taxed is set forth in subchapter T of the Internal Revenue Code. Secs. 1381 through 1388. In addition to the other deductions allowable under chapter 1 of the Internal Revenue Code, exempt farmers' cooperatives are permitted those deductions specifically allowed under section 1382. In pertinent part, section 1382 provides:

SEC. 1382. TAXABLE INCOME OF COOPERATIVES.

(b) PATRONAGE DIVIDENDS AND PER-UNIT RETAIN ALLOCATIONS.—In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year—

(1) as patronage dividends (as defined in section 1388(a)), to the extent paid in money, qualified written notices of allocation (as defined in section 1388(c)), or other property (except nonqualified written notices of allocation (as defined in section 1388(d)) with respect to patronage occurring during such taxable year;

(2) in money or other property (except written notices of allocation) in redemption of a nonqualified written notice of allocation which was paid as a patronage dividend during the payment period for the taxable year during which the patronage occurred;

(3) as per-unit retain allocations (as defined in section 1388(f)), to the extent paid in money, qualified per-unit retain certificates (as defined in section 1388(h)), or other property (except nonqualified per-unit retain certificates, as defined in section 1388(i)) with respect to marketing occurring during such taxable year; or

(4) in money or other property (except per-unit retain certificates) in redemption of a nonqualified per-unit retain certificate which was paid as a per-unit retain allocation during the payment period for the taxable year during which the marketing occurred.

---

[10]Although "exempt" organizations, like petitioner, are subject to tax, they are otherwise treated the same as organizations exempt under sec. 501. See sec. 1.1381–2(a), Income Tax Regs.

For purposes of this title, any amount not taken into account under the preceding sentence shall, in the case of an amount described in paragraph (1) or (2), be treated in the same manner as an item of gross income and as a deduction therefrom, and in the case of an amount described in paragraph (3) or (4), be treated as a deduction in arriving at gross income.

As indicated in section 1382(b), patronage dividends[11] reduce a cooperative's taxable income only if they are paid in money, property, or qualified written notices of allocation. The term "qualified written notice of allocation" is defined in section 1388(c), wherein it states:

SEC. 1388(c). QUALIFIED WRITTEN NOTICE OF ALLOCATION.—

(1) DEFINED.—For purposes of this subchapter, the term "qualified written notice of allocation" means—

(A) a written notice of allocation which may be redeemed in cash at its stated dollar amount at any time within a period beginning on the date such written notice of allocation is paid and ending not earlier than 90 days from such date, but only if the distributee receives written notice of the right of redemption at the time he receives such written notice of allocation; and

(B) a written notice of allocation which the distributee has consented, in the manner provided in paragraph (2), to take into account at its stated dollar amount as provided in section 1385(a).

Such term does not include any written notice of allocation which is paid as part of a patronage dividend or as part of a payment described in section 1382(c)(2)(A), unless 20 percent or more of the amount of such patronage dividend, or such payment, is paid in money or by qualified check.

(2) MANNER OF OBTAINING CONSENT.—A distributee shall consent to take a written notice of allocation into account as provided in paragraph (1)(B) only by—

(A) making such consent in writing,

(B) obtaining or retaining membership in the organization after—

(i) such organization has adopted (after the date of the enactment of

---

[11]Patronage dividends are defined in sec. 1388(a), as follows:

SEC. 1388(a). PATRONAGE DIVIDEND.—For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies—

(1) on the basis of quantity or value of business done with or for such patron,

(2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and

(3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.

the Revenue Act of 1962) a bylaw providing that membership in the organization constitutes such consent, and

(ii) he has received a written notification and copy of such bylaw, or

(C) if neither subparagraph (A) nor (B) applies, endorsing and cashing a qualified check, paid as a part of the patronage dividend or payment of which such written notice of allocation is also a part, on or before the 90th day after the close of the payment period for the taxable year of the organization for which such patronage dividend or payment is paid.

Thus, the deductibility of patronage dividends[12] embodied in a written notice of allocation depends on whether the written notice is redeemable within the statutory period, or whether the recipient consents to include such amount in his taxable income. Section 1388(c)(2) provides three alternative means by which a recipient of a written notice may consent to include the noncash patronage dividend in income. The recipient may consent in writing (sec. 1388(c)(2)(A)), by retaining membership in the distributing organization provided that such organization has a bylaw consent provision and the recipient has received a written notification and copy of the bylaw (sec. 1388(c)(2)(B)), or by endorsing and cashing a qualified check (secs. 1388(c)(2)(C) and 1388(c)(4)).

Pursuant to its bylaws, petitioner allocated its 1973 and 1974 net earnings among its members based on their annual patronage. Petitioner paid 20 percent of these patronage dividends by check and issued certificates of equity for the remaining 80 percent. Petitioner deducted the entire amount of these patronage dividends in computing its 1973 and 1974 taxable income. Respondent does not dispute the deductibility of the amounts paid by check (sec. 1382(b)(1)), nor does he dispute the deductibility of the amounts represented by certificates of equity issued to those members whose membership dates back to 1967 (sec. 1388(c)(2)(B)).[13] Rather, respondent disallowed only those patronage dividends reflected in the certificates of equity issued to petitioner's post–1967 members.

---

[12]For convenience, we will refer to patronage dividends as deductions. We offer no comment, however, on whether patronage dividends are deductions or exclusions. See sec. 1.1382–1(a), Income Tax Regs.

[13]The significance of the 1967 date relates to the amendments made to art. 29, sec. 7 of petitioner's bylaws. That section, as amended, contains a bylaw consent provision. Petitioner's membership was notified of these changes by a newsletter distributed in 1967. There is, however, no evidence in the record that post–1967 members ever received copies of this bylaw provision pursuant to sec. 1388(c)(2)(B)(ii).

Respondent contends that although the certificates of equity issued to post–1967 members constitute "written notices of allocation" under section 1388(b), they do not constitute "qualified" written notices of allocation because petitioner's members failed to properly consent under any of the methods provided in section 1388(c)(2).[14] On the other hand, petitioner argues that its post–1967 members consented in writing in two different ways to include in their incomes the amounts stated on the certificates of equity.[15]

First, petitioner contends that the membership agreements signed by the post–1967 members constitute the requisite written consents. In support of this contention, petitioner relies on the language of the membership agreement which states that "signing of this contract shall be considered the signing of any application for membership in the Association and an agreement to abide by all rules and regulations thereof." According to petitioner, the rules and regulations by which each member agreed to abide include its bylaws and, more specifically, the consent provision contained in article 29, section 7 of those bylaws.[16]

The second mode of compliance asserted by petitioner relates to the endorsement and cashing of the 20-percent patronage dividend checks by the post–1967 members. On this point, petitioner attaches substantial significance to the fact that the dividend checks were always mailed in packets containing a certificate of equity, a certificate of retains, and a Form 1099-PATR. Petitioner asserts that the endorsing and cashing of the dividend check, in light of the directives printed on both the certificate of retains and the Form 1099-PATR to include the stated amounts in income (see notes 7 & 8 *supra* ) sufficiently satisfies the written consent requirement.

For the reasons stated below, we find that petitioner's

---

[14]The parties agree that the certificates of equity were not redeemable within the statutory period provided under sec. 1388(c)(1).

[15]Petitioner concedes that the requirements of secs. 1388(c)(2)(B) and 1388(c)(2)(C) have not been satisfied. See note 13 *supra*. Accordingly, petitioner must rely on the consent-in-writing requirement of sec. 1388(c)(2)(A).

[16]On brief, petitioner argues that we should consider certain statements allegedly made to new members by its field representatives. No field representative testified at trial regarding such statements and, accordingly, they are inadmissible as hearsay. Fed. R. Evid. 802.

members have not complied with the requirements of section 1388(c)(2).

To our knowledge, this is the first case interpreting the consent provisions of section 1388(c)(2). In light of the issue's novelty, a retracing of the section's legislative history is warranted.[17]

Under section 101(12) of the 1939 Code, the earnings of qualifying farm cooperatives were exempt from tax regardless of whether such earnings were distributed to its patrons. At the same time, the earnings of nonexempt cooperatives were subject to tax although numerous cases and administrative rulings recognized the rights of these cooperatives to exclude patronage dividends from their gross incomes.[18] In 1951, Congress enacted legislation which, in part, attempted to eliminate the competitive advantage enjoyed by exempt cooperatives in accumulating capital with tax-free dollars. See S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 472, 473. As a consequence of new section 101(12)(B) of the 1939 Code, earnings of exempt cooperatives were subjected to tax. In addition, the newly enacted section provided that patronage dividends of exempt cooperatives "shall be taken into account in computing net income in the same manner as in the case of a [nonexempt] cooperative organization." Sec. 101(12)(B), I.R.C. 1939.[19]

Although the 1951 legislation did not address the taxability of patronage dividends to a cooperative's patrons, it was generally believed that the combined effect of that legislation and prior Treasury rulings insured that a cooperative's net earnings would be currently taxable to either the cooperative or its patrons. See, e.g., H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 402, 482; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 703, 817; S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458,

---

[17]For excellent discussions of the legislative history of subch. T and its predecessor, see Wile, "Taxation of Farmers' Cooperatives and Their Patrons," 1966 S. Calif. Tax Inst. 449 (1966); Logan, "Federal Income Taxation of Farmers' and Other Cooperatives," 44 Tex. L. Rev. 250, 1269 (1966). See also *Farmers Cooperative Co. v. Birmingham*, 86 F. Supp. 201 (N.D. Iowa 1949).

[18]See note 12 *supra*.

[19]The 1951 legislation did not eliminate all the differences between the taxation of exempt and nonexempt cooperatives. For instance, exempt cooperatives were permitted deductions for nonpatronage allocations. Sec. 101(12)(B)(ii), I.R.C. 1939. This same discrepancy has been carried forward to subch. T. See sec. 1382(c).

473. This presumed symmetry was shattered by subsequent judicial decisions. Most notable among these were *Long Poultry Farms, Inc. v. Commissioner*, 249 F.2d 726 (4th Cir. 1957), and *Commissioner v. Carpenter*, 219 F.2d 635 (5th Cir. 1955). These cases, in general, permitted patrons to exclude noncash patronage dividends from current income while permitting current deductions to the cooperative for these very same allocations. The courts were not oblivious to this inconsistent treatment, yet they attributed the situation to the drafting of the 1951 legislation. As the court in *Long Poultry Farms, Inc. v. Commissioner, supra,* stated at page 731:

> The Commissioner places great weight on the argument that by 26 U.S.C. Sec. 101(12)(B) an exempt cooperative is permitted to deduct from gross income patronage dividends such as are here involved and that there was testimony before committees of Congress to the effect that these would be returned for taxation by the recipients. The answer is that Congress while granting the right to the deduction by the cooperative left the matter of taxing the dividends to the recipients to be dealt with by existing law, making no change whatever with regard thereto * * *

Faced with this "whipsaw" situation, Congress adopted subchapter T of the 1954 Code in 1962 in order to insure the symmetrical treatment of patronage dividends. See, e.g., H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 402, 482. As stated in the legislative history of a subsequent amendment to subchapter T:

> The patronage dividend provisions of the Revenue Act of 1962 were designed to assure that the amounts received by cooperatives in the course of their business activities with their patrons are included in computing the income tax of either the cooperative or the patron, thus subjecting these amounts to a single current tax. To accomplish this, the 1962 act provided detailed rules which specified the treatment which patronage dividends are to receive from the standpoint of both cooperatives and their patrons. It was hoped that these provisions would bring to an end the uncertainty that existed in the area of cooperative-patron income taxation and consequently bring to a halt the litigation that the uncertainty engendered. * * * [S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 1055, 1108.]

Crucial to this entire statutory scheme, were the consent provisions presently in issue. Their import is reflected in the reports of both Houses of Congress: "Your committee believed that, since in the case of either the 90-day or consent allocation the patrons have constructively received the dividend and reinvested it, it is clear * * * that it constitutes income to the patron and is properly taxable to him." H. Rept. 1447, 87th

Cong., 2d Sess. (1962), 1962–3 C.B. 402, 483. See also S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 703, 821.

Whether patronage dividends under section 1382(b) are categorized as exclusions or deductions (see note 12, *supra*), it is axiomatic that such provisions are a matter of legislative grace and must be strictly construed. See, e.g., *McCamant v. Commissioner*, 32 T.C. 824, 834 (1959); *Co-operative Oil Ass'n. v. Commissioner*, 115 F.2d 666, 668 (9th Cir. 1940), affg. a Memorandum Opinion of this Court. But even beyond this, the legislative history of subchapter T dictates that we strictly construe its provisions. See *Seiners Association v. Commissioner*, 58 T.C. 949, 955 n. 5 (1972) (strictly construing section 1388(b)). Congress has provided a detailed, well-integrated approach to the cooperative-patron relationship in order to minimize the uncertainties and inconsistencies that preceded the subchapter's enactment. We decline to tinker with this legislative design and our analysis below reflects this reluctance.

Petitioner concedes that neither of the two writings relied upon, the membership agreement or the endorsed check, contains on its face specific language consenting to the inclusion of the noncash patronage dividends into income. Nonetheless, petitioner requests that we look beyond the actual writings for the requisite consent. In the case of the membership agreement, petitioner asks us to incorporate by reference the consent provision contained in its bylaws. With respect to the endorsed check, petitioner suggests that we consider the totality of the circumstances surrounding the check's issuance and endorsement. Unfortunately for petitioner, the statute may not be read so broadly as to encompass these situations.

Initially we note that petitioner's interpretation, in the context of this case, would transform the other two statutory modes of consent into mere surplusage.[20] If Congress had intended membership in a cooperative having a bylaw consent provision to be a sufficient act of consent, it could have easily so provided. In section 1388(c)(2)(B), however, Congress went beyond this in requiring that the member receive a written

---

[20]This is not meant to imply that a membership agreement or an endorsed check may never constitute a consent in writing. For example, if these documents contain express terms by which the signer agrees to treat all noncash allocations as constructively received and reinvested, then a different result may apply. See pp. 1017–1018 *infra.*

notification and copy of the bylaw provision. Having failed to comply with that requirement,[21] petitioner now seeks to avoid the consequences of that failure. The same is true with petitioners' endorsed-check argument. Congress could have provided that the mere endorsement of a check representing a portion of one's patronage dividend constitutes a consent to include in income the entire amount. Instead, Congress provided for consent by endoresement only if "there is clearly imprinted [on the check] a statement that the endorsement and cashing of the check * * * constitutes the consent of the payee to include in his gross income * * * the stated dollar amount of the written notice of allocation." Sec. 1388(c)(4). None of the checks issued by petitioner, however, contained the necessary imprint.

Furthermore, we believe the consent-in-writing provision and the accompanying regulations require that the writing contain, on its face, an explicit statement to the effect that the signing patron or member consents to include in income currently the amount stated on the written notice of allocation.[22] A number of considerations lead to this conclusion.

First, explicit reference to the patron's consent on the face of the writing is best suited to achieve the certainty the statute was intended to produce. Once we go beyond the writing itself to ascertain whether consent has been given, we run the risk of recreating the confused and uncertain state that predated the enactment of subchapter T.[23]

Second, support for this position is evidenced in the regula-

---

[21]We presume this from petitioner's concession that sec. 1388(c)(2)(B) is inapplicable. See notes 13 & 15 *supra.*

[22]We recognize that our approach herein is a narrow one. For example, although the signing of a membership agreement wherein it states the signer will abide by the organization's rules and regulations is not a sufficient consent in writing, a different result might be dictated where the signed agreement makes specific reference to a bylaw consent provision and summarizes its terms.

[23]For instance, if we were to accept petitioner's position with respect to the signed membership agreements, we would be creating a potential repeat of the situation in *Long Poultry Farms,* a case precipitating the enactment of subchapter T. See *Long Poultry Farms, Inc. v. Commissioner,* 249 F.2d 726 (4th Cir. 1957). In that case, the taxpayer successfully argued that noncash allocations of patronage dividends were not taxable currently to him despite the existence of a provision in the cooperative's bylaws that "all [noncash] amounts shall have the same status as though they had been paid to patrons in cash in pursuance of a legal obligation to do so and the patrons had then furnished corresponding amounts for capital for the association." 249 F.2d at 727.

tions accompanying section 1388(c)(2). Sec. 1.1388–1(c)(3)(i), Income Tax Regs., provides:

> (i) *Consent in writing.* A distributee may consent to take the stated dollar amount of written notices of allocation into account under section 1385 by signing and furnishing a written consent to the cooperative organization. No special form is required for the written consent so long as *the document on which it is made clearly discloses the terms of the consent.* Thus, the written consent may be made on a signed invoice, sales slip, delivery ticket, marketing agreement, or other document, *on which appears the appropriate consent.* * * * [Emphasis supplied.]

In our view the above regulation clearly dictates that a valid written consent must expressly disclose, on its face, the terms of the consent.[24] See also sec. 1.61–5(d)(2)(ii), Income Tax Regs.[25]

Third, the requirement of an explicit statement on the face of the consent comports with the other statutory alternatives under section 1388(c)(2).[26] The detail and specificity of the

---

[24]In his reply brief, petitioner makes a passing remark that sec. 1.1388–1(c)(3)(i), Income Tax Regs., is "not binding and is unduly restrictive as it goes far beyond the language and intent of Code section 1388(c)(2)(A), which sets forth a much broader requirement of a 'consent in writing.'" Due to the general nature of petitioner's complaint, we are hardpressed to provide any specific response. In general, however, we believe the regulation comports with the statute and its legislative history, as examined herein. In any event, petitioner has provided us with no "weighty reasons" for invalidating this regulation. *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948).

[25]Sec. 1.61–5(d)(2), Income Tax Regs., deals with the cooperative-patron relationship in the taxation of per-unit retain certificates. See secs. 1382(b)(3), 1388(h). The tax treatment of these amounts parallels the treatment prescribed for patronage dividends. See S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 1055, 1108. For instance, a cooperative may deduct the amounts stated on per-unit retain certificates if the distributees agree to take the stated amounts into income currently. Secs. 1382(b)(3), 1388(h)(1). As with patronage dividends, one method by which a distributee may agree to include retain certificates into income is by written agreement. Sec. 1388(h)(2)(A). In discussing this mode of agreement, sec. 1.61–5(d)(2)(ii), Income Tax Regs., provides an example which would meet the requirements of sec. 1388(h)(2)(A):

"I agree that, for purposes of determining the amount I have received from this cooperative in payment for my goods, I shall treat the face amount of any per-unit retain certificates issued to me on or after _____ as representing a cash distribution which I have constructively received and which I have reinvested in the cooperative.

_____
Signed "

Although the example relates to per-unit retain certificates and not patronage dividends, the two situations are sufficiently analogous to aid in our interpretation of sec. 1388(c)(2)(A). Moreover, the fact that the cited passage is but one form that a consent agreement may take does not detract from its utility as an interpretive tool. Accordingly, we believe the explicit language used in the above example supports our interpretation of sec. 1388(c)(2)(A).

[26]Petitioner contends that we should not view all three consent alternatives in the same light. According to petitioner, sec. 1388(c)(2)(A) should be interpreted as a broad, umbrella provision

requirements set forth in the consent provisions are designed to insure that patrons are properly charged with constructive receipt of the noncash patronage dividends deducted currently by the cooperative. S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 1055, 1108; H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 402, 482; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 821. In furtherance of this objective, the statute attempts to elicit unambiguous, affirmative acts of consent from the cooperative's patrons.

Under either the bylaw consent approach (sec. 1388(c)(2)(B)) or the qualified check approach (sec. 1388(c)(2)(C)), compliance with the statutory requirements is sufficient in itself to guarantee that the patron's consensual act, i.e., retention of his membership or endorsement of the check, will be an informed and unambiguous one. The prior receipt of a copy of the bylaw consent provision or the language imprinted on a qualified check adequately serves this purpose. In contrast, a writing under section 1388(c)(2)(A) will exhibit these same guarantees only if the statute is interpreted as requiring disclosure of the terms of the consent on the face of the writing. Without such an explicit requirement, we would be left to imply the quality of a patron's consent from surrounding circumstances. We do not believe Congress intended such a result especially in light of its artful drafting of the sister provisions to section 1388(c)(2)(A) and its aversion to expose this area to potential uncertainties. Rather, we believe a written consent under section 1388(c)(2)(A) must reveal, on its face, the informed nature of the patron's consent.

Finally, the statutory language itself supports our statutory construction. The provision, when read literally, requires a "consent *in* writing." Sec. 1388(c)(2)(A) (emphasis added).

In light of the above statutory construction, it is clear that petitioner may not prevail. Neither of the two writings relied upon by petitioner, i.e., the membership agreement or the

---

with sec. 1388(c)(2)(B) and (C) serving as very specific "safe harbor" provisions. In proposing this approach, petitioner hopes to avoid a strict interpretation of sec. 1388(c)(2)(A). Petitioner supports his argument by analogy to sec. 302(b). We do not agree with petitioner's analysis. Unlike the legislative history of sec. 302(b) (S. Rept. 1622, 83d Cong., 2d Sess. 44–45 (1954)), the legislative history of sec. 1388(c)(2) provides no basis for interpreting the consent-in-writing provision as a statutory catchall. In fact, the legislative history of sec. 1388(c)(2) treats all three consent alternatives equally. In the absence of any legislative directives to the contrary we will do likewise.

endorsed check, contains the requisite consent on its face. Consequently, petitioner has failed to satisfy the statute.

Perhaps realizing it may not prevail under the language of the statute, petitioner claims that the facts in this case indicate "good faith compliance with the spirit of the law." Central to this claim is petitioner's belief that the underlying purpose of the consent provisions is to insure that the patrons know their noncash distributions are taxable. According to petitioner, this purpose has been satisfied by the distribution of certain documents and forms,[27] especially Form 1099-PATR. See note 8 *supra*. We disagree with petitioner's focus. While Congress could have tied deductibility of noncash patronage dividends to the distribution of Form 1099-PATR, it did not do so. Rather, Congress evidently believed that merely informing a patron of the tax consequences of his noncash allocations would not adequately protect the public fisc against a repeat of the *Long Poultry Farms* and *Carpenter* cases *supra*. As a result, Congress took great pains to insure that a patron's consent is in hand before it grants the cooperative a current deduction. In this case, petitioner has come before us emptyhanded and, accordingly, its deduction is denied.[28]

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[27]Petitioner also refers to the distribution of the Sept. 13, 1973, newsletter. See p. 1007 *supra*.
[28]As alternative grounds for denying the claimed deductions, respondent asserts that petitioner has failed to demonstrate the timeliness of the consents (see sec. 1388(c)(3)(A)(i)), or their revocable nature (see sec. 1388(c)(3)(B)(i)). We will not address these alternatives in light of the result reached herein.