ESTATE OF ALEXANDER S. BOWERS, DECEASED, ROBERT M. MUSSELMAN, EXECUTOR, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 37702-87.        Filed April 16, 1990.

*Douglas E. Little,* for the petitioner.
*Deborah C. Stanley,* for the respondent.

OPINION

RAUM, *Judge:* Petitioner is the Estate of Alexander S. Bowers. The Commissioner determined deficiencies in the decedent's income tax for the calendar years 1982 and 1983 in the amounts of $43,211.42 and $216,851, respectively. The decedent was a resident of Virginia, and Robert M. Musselman, executor of his estate, was also a resident of Virginia when the petition herein was filed. After concessions, the parties agree that the only remaining issue is whether decedent's transfer of an oil and gas lease, and acquisition of a farm constituted an "exchange" which qualifies for nonrecognition of gain under section 1031. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. This case was submitted on the basis of a stipulation of facts and a stipulation of issues.

*Facts.* On April 28, 1982, by letter addressed to American Quasar Petroleum Co. (American Quasar), Bowers agreed to sell a Federal oil and gas lease to it for $2 million. On May 13, 1982, American Quasar endorsed its acceptance of the agreement on that letter, and, as required therein, paid $400,000 earnest money deposit to Bowers on the same day. The remaining $1,600,000 was to be paid upon delivery of an executed assignment of the lease. The assignment was to be made on a form acceptable to the Bureau of Land Management. Delivery of the assignment was to be made "no sooner than 12 months from the simultaneous drawing date of February 25, 1982, and no later than 30 days

following the 12 month anniversary date of February 25, 1982."

Browne Land Trust (the trust) was an entity of which Henry J. Browne was both trustee and a beneficiary. Neither the trust nor Mr. Browne nor anyone else associated with the trust in any way was shown to have any connection with Bowers or American Quasar. At some undisclosed time prior to July 1982, the trust entered into an agreement to purchase approximately 441 acres known as Hickory Ridge Farm (the farm) for a gross purchase price of $870,000 plus $7,000 for the purchase of the sellers' Federal Land Bank stock.

By letter dated July 6, 1982, the trust agreed to transfer its interest in the farm to Bowers for an additional $200,000. Thus, the offer by the trust was to sell the stock and the farm for a total of $1,077,000, plus payment of closing costs and 1 year's insurance premium. The purchase price was to be paid as follows:

(a) Assumption of a Federal Land Bank loan in the approximate amount of $120,000, plus purchase of the sellers' Federal Land Bank stock for $7,000;

(b) Assumption or payoff of a second lien deed of trust note to the trust's grantor in the principal amount of $380,000;

(c) A temporary note for $322,000;

(d) A temporary note for $200,000; and

(e) Cash of $55,000 to be paid on July 7, 1982, "time being of the essence."

On July 7, 1982, the trust purchased the farm and the sellers' Federal Land Bank stock for $877,000 as follows:

| | | |
|---|---|---|
| To agreed purchase price | $870,000.00 | |
| By assumption of Federal Land Bank deed of trust | | $118,411.44 |
| By interest due to sellers but payable in Oct. 1st installment on Federal Land Bank loan | | 5,466.66 |
| To purchase of Federal Land Bank stock | 7,000.00 | |
| By two second lien deferred purchase money bonds | | 380,000.00 |
| By sellers' share of recording tax | 682.00 | |

| | | |
|---|---|---|
| By sellers' share of 1982 real estate taxes on 333.7 acres | $2,473.73 | |
| By sellers' share of 1982 real estate taxes on 117.910 acres | | $658.46 |
| By certified or cashier's check | | 369,507.71 |
| | 877,000.00 | 877,200.00 |

The cash paid by the trust at closing was obtained from Bowers as follows:

| | | |
|---|---|---|
| By proceeds of loan per temporary note of July 6, 1982 | | $322,000.00 |
| By deposit made June 30, 1982 by Bowers | | 5,000.00 |
| By proceeds of loan to Bowers from National Bank & Trust Co. | | 55,000.00 |
| By interest earned on $5,000 deposit —7 days at 5.24% | | 5.06 |
| To fees, expenses, and closing costs incurred by Trust in closing purchase of the farm | $1,950.94 | |
| To gross purchase price paid for purchase of the farm | 369,507.71 | |
| To Bowers, interest on deposit | 5.06 | |
| To balance refunded to Bowers | 10,541.35 | |
| | 382,005.06 | 382,005.06 |

The sum of $10,541.35 was refunded to Bowers by the attorney for the trust on or about July 9, 1982.

As disclosed by Bowers' 1982 Federal income tax return, he assumed the benefits and burdens of ownership of the farm during that year. He was thus at least in constructive possession of the farm after the foregoing transactions in July 1982, and, either personally or through others (including possibly the trust) acting on his behalf, conducted farming operations thereon for the remainder of 1982. Schedule F of his 1982 return was concerned with income and expenses of a farming business conducted by the taxpayer, and identified the farm as "Hickory Ridge Farm." The income and deductions reported on that schedule (together with an attachment thereto) related exclusively to the farm purchased by Bowers from Browne Land Trust. Schedule F reported total income of $545, consisting of $420 from the sale of hay and grain and $125 as pasture rent. It also claimed deductions, as follows:

| | | |
|---|---:|---:|
| Labor hired | | $15,187.77 |
| Repairs, maintenance | | 3,944.14 |
| Interest | | 46,534.06 |
| Feed purchased | | 1,513.97 |
| Machine hire | | 412.62 |
| Supplies purchased | | 3,983.65 |
| Veterinary fees, medicine | | 144.00 |
| Taxes | | 3,706.95 |
| Insurance | | 7,058.00 |
| Utilities and telephone | | 699.95 |
| Other (per attached schedule): | | |
|    Agricultural consultant | $593.00 | |
|    Small tools | 178.10 | |
|    Advertising | 160.70 | |
|    Office supplies | 627.47 | |
|    Employee lodging | 13,400.00 | |
|    Travel and entertainment | 6,812.99 | |
|    Payroll taxes | 780.07 | |
|    Bank charges | 102.93 | |
|    Business gifts | 67.79 | 22,723.05 |
| Total | | 105,908.16 |
| Depreciation | | 25,128.25 |
| Total deductions | | 131,036.41 |

Schedule F then reported a net farm loss of $130,491.41 after taking into account the $545 income received. That $130,491.41 loss was then transferred to line 19 of Bowers' 1040, and served to reduce his adjusted gross income and in turn his taxable income by that amount.

In December 1982, Bowers borrowed $600,000 from the National Bank & Trust Co. of Charlottesville, Virginia. The loan was secured by a mortgage on the Federal oil and gas lease under contract to American Quasar. The mortgage was subject to the rights of American Quasar. The record does not explain what use Bowers made of these borrowed funds.

By instrument dated February 24, 1983, the National Bank & Trust Co. stated that the mortgage was fully satisfied and thus it released its lien on the Federal oil and gas lease. The parties have stipulated that in February 1983, Bowers' April 28, 1982, agreement to sell the Federal oil and gas lease to American Quasar and his July 6, 1982, agreement to purchase the farm from the trust were restructured as follows:

(a) By agreement dated February 28, 1983, the Browne Land Trust agreed to convey Hickory Ridge Farm to American Quasar for the total sum of $1,148,664.19, which consisted of the following sums:

(1) $1,070,000, based upon the purchase price for Hickory Ridge Farm, less the $7,000 which had been allocated to purchase the Federal Land Bank stock;

(2) $1,950.94 in closing costs and insurance;

(3) $76,713.25 for improvements constructed on the property since the July 7, 1982, purchase by the Browne Land Trust;

(b) By a separate agreement dated February 28, 1983, American Quasar agreed to pay $351,335.81 to the Browne Land Trust for certain improvements to be constructed on the Hickory Ridge property;

(c) By a third agreement dated February 28, 1983, American Quasar agreed to assign its contract interest in Hickory Ridge to Bowers as consideration for the assignment of the Federal oil and gas lease. The agreement provided that American Quasar would direct the conveyance of Hickory Ridge Farm to be made directly to Bowers. It also provided that American Quasar would pay $80,000 to Henry J. Browne, Trustee for the Browne Land Trust, in cash at closing for Bowers.

The foregoing transactions were consummated on March 15, 1983. By letter dated March 15, 1983, from Craig R. Carver, counsel for American Quasar, to Edgar O. Kinnier, of National Bank & Trust Co., American Quasar paid to Henry J. Browne, Trustee, the sum of $1,580,000, which represented the total purchase price for the land and improvements and the $80,000 paid to the trust for Bowers at closing.[1]

As explained by Bowers' attorney in a letter dated February 25, 1983, to American Quasar, the purpose of restructuring the transaction was to have it "qualify as a tax free exchange and thus to save or defer payment of income tax which Mr. Bowers would otherwise be required to pay at this time." He added that "It is also our intention

---

[1]The record leaves unexplained the $20,000 discrepancy between the $1,600,000 remaining to be paid by American Quasar and the $1,580,000 actually paid pursuant to the restructured agreements.

that the transaction, as restructured, will result in no additional expense to American [Quasar]." And he stated further that "upon payment of the $1,600,000.00, American [Quasar] would have no further obligation to anyone," and that, if it should, "any expenses in excess of its obligations under the existing agreement with Bowers, including any additional attorney's fees in reviewing the documents, Bowers agrees to reimburse American [Quasar] for all such expenses." Moreover, in the restructured contract of "sale and exchange" dated February 28, 1983, Bowers assumed all of American Quasar's obligations in respect of the purchase of the farm except for the payment of $1,148,664.19 for the farm, and he agreed "to hold American Quasar harmless from all other obligations under" the contract to purchase the farm.

*Whether section 1031 relating to exchanges of property applies to relieve Bowers of tax with respect to gain realized upon disposition of his oil and gas lease to American Quasar.* By agreement of April 28, 1982, Bowers undertook to sell his oil and gas lease for $2 million to American Quasar and in fact received $400,000 shortly thereafter from it as earnest money. In an entirely separate transaction several months later he entered into an agreement to purchase Hickory Ridge Farm from the Browne Land Trust for $1,070,000 plus $7,000 for some apparently related Federal land bank stock and plus payment of closing costs and 1 year's insurance premium. There is no dispute between the parties herein that the agreement to sell the oil and gas lease to American Quasar, structured as a cash sale, and the agreement to purchase the farm from the Browne Land Trust, structured as a cash purchase, were unrelated. Petitioner nevertheless contends that as a consequence of a restructuring of both these agreements in three new agreements dated February 28, 1983, American Quasar purchased the farm from Browne Land Trust and "exchanged" it with Bowers for the oil and gas lease plus a cash payment. Whether there was thus a nonrecognizable "exchange" in 1983 that would relieve Bowers of tax (apart from tax on "boot") depends upon the applicability of section 1031(a) of the Internal Revenue Code. As in effect during the years in issue, section 1031(a) provided:

SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment * * * is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment. [See also sec. 1.1031(a)-1, Income Tax Regs.]

Ordinarily, section 1001(c) requires that the gain or loss realized upon the sale or other disposition of property "be recognized." However, section 1031(a) sets out an exception to that general rule in the case of an "exchange" of property under certain conditions. At issue is whether the threshold requirement of an "exchange" was met, namely, whether there was an "exchange" of Bowers' oil and gas lease for the farm. We hold that there was no such qualifying "exchange," that Bowers sold his oil and gas lease for cash, and that he purchased the Hickory Ridge Farm for cash—all notwithstanding an attempt to "restructure" the two transactions to make it appear that there was an "exchange" of the lease for the farm.

It is well settled that there is no qualifying "exchange" merely because the seller at the same time purchases other property. As was stated in *Coastal Terminals, Inc. v. United States*, 320 F.2d 333, 337 (4th Cir. 1963):

The purpose of Section 1031(a), as shown by its legislative history, is to defer recognition of gain or loss when a direct exchange of property between the taxpayer and another party takes place; *a sale for cash does not qualify as a nontaxable exchange even though the cash is immediately reinvested in like property.* [See also *Carlton v. United States*, 385 F.2d 238, 242 (5th Cir. 1967). Cf. *Bell Lines, Inc. v. United States*, 480 F.2d 710 (4th Cir. 1973). Emphasis supplied.]

Similarly, in a case involving a variant of the multi-party, like-kind exchange set of transactions, this Court stated: "The touchstone of section 1031, at least in this context, is the requirement that there be an *exchange* of like-kind business or investment properties, as distinguished from a cash sale of property by the taxpayer and a reinvestment of the proceeds in other property." (Emphasis in original.) *Barker v. Commissioner*, 74 T.C. 555, 560-561 (1980).

Notwithstanding the familiar and longstanding rule that exemptions are to be narrowly or strictly construed,[2] section 1031 has been given a liberal interpretation. *Biggs v. Commissioner,* 69 T.C. 905, 913-914 (1978), affd. 632 F.2d 1171 (5th Cir. 1980). Typical is a case involving the so-called "three-corner" exchange, which was described in *Biggs,* 69 T.C. at 913, as follows:

> In such a transaction, the taxpayer desires to exchange, rather than to sell, his property. However, the potential buyer of the taxpayer's property owns no property the taxpayer wishes to receive in exchange. Therefore, the buyer purchases other suitable property from a third party and then exchanges it for the property held by the taxpayer.

Examples of such qualifying "exchanges" may be found in *Alderson v. Commissioner,* 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962); *Bell Lines, Inc. v. United States,* 480 F.2d 710 (4th Cir. 1973); *Garcia v. Commissioner,* 80 T.C. 491 (1983); *Brauer v. Commissioner,* 74 T.C. 1134 (1980); *Barker v. Commissioner,* 74 T.C. 555 (1980); *124 Front Street, Inc. v. Commissioner,* 65 T.C. 6 (1975); *Coupe v. Commissioner,* 52 T.C. 394 (1969); *J.H. Baird Publishing Co. v. Commissioner,* 39 T.C. 608 (1962); *Mercantile Trust Co. of Baltimore, Trustees v. Commissioner,* 32 B.T.A. 82 (1935). As was indicated in those cases, as well as in others cited therein, taxpayers have been given considerable latitude in structuring such transactions. However, such latitude is not open-ended. There is a limit beyond which

[2]Cf., e.g., *Bingler v. Johnson,* 394 U.S. 741, 752 (1969) ("exemptions from taxation are to be construed narrowly"); *Commissioner v. Jacobson,* 336 U.S. 28, 49 (1949) ("exemptions * * * should be construed with restraint"); *Bank of Commerce v. Tennessee,* 161 U.S. 134, 146 (1896) ("a well founded doubt is fatal to the claim [for exemption]"); *Storall Manufacturing Co., Inc. v. United States,* 755 F.2d 664, 665 (8th Cir. 1985) ("tax exemptions are a matter of legislative grace, and as such are narrowly construed"); *Levy v. Commissioner,* 732 F.2d 1435, 1436 (9th Cir. 1984) ("Exemptions from taxation are matters of legislative grace and will be construed narrowly"); *Central Tablet Manufacturing Co. v. United States,* 481 F.2d 954, 960 (6th Cir. 1973) ("We have recently reaffirmed in a case involving another nonrecognition statute the 'well settled principle that statutes granting tax exemptions or deferments must be strictly construed,'"); *Elam v. Commissioner,* 477 F.2d 1333, 1335 (6th Cir. 1973) ("statutes granting tax exemptions or deferments must be strictly construed"); *Miller v. Commissioner,* 93 T.C. 330, 340 (1989) ("statutes excluding items from gross income are to be narrowly construed"); *Butka v. Commissioner,* 91 T.C. 110, 117 (1988), affd. without published opinion 886 F.2d 442 (D.C. Cir. 1989) ("deductions and exemptions from taxation are to be narrowly construed"); *Independent Co-op Milk Producers v. Commissioner,* 76 T.C. 1001, 1014 (1981) ("Whether * * * categorized as exclusions or deductions * * * it is axiomatic that such provisions are a matter of legislative grace and must be strictly construed"); *Associated Barbers & Beauticians v. Commissioner,* 69 T.C. 53, 62 (1977) ("A statute creating an exemption must be strictly construed, and any doubt must be resolved in favor of the taxing power").

section 1031(a) may not be stretched, and that limit was plainly indicated in *Coupe v. Commissioner,* where the Court stated (52 T.C. at 405):[3]

It is now well settled that when a taxpayer who is holding property for productive use in a trade or business enters into an agreement to sell the property for cash, but *before there is substantial implementation* of the transaction, arranges to exchange the property for other property of like kind, he receives the nonrecognition benefits of section 1031. * * * [Emphasis supplied.]

It is quite true that the "substantial implementation" language in *Coupe* was specifically addressed to that half of the restructured transaction relating to the sale of the taxpayer's property. It seems clear, however, that it is equally applicable to the companion half relating to his purchase of the replacement property. Each is merely the other side of the same coin. And we are firmly convinced here that there was "substantial implementation" of Bowers' purchase of the farm prior to the attempt to recast the sale of the lease and the purchase of the farm in the mold of an "exchange." The evidence in the stipulated record overwhelmingly points in that direction. In any event, it must be remembered that the burden of proof was upon petitioner, and it has not presented any satisfying evidence tending to overcome the evidence that is before us. That evidence convincingly establishes that there was "substantial implementation" of Bowers' purchase of the farm in 1982, long before that purchase and the sale of the oil and gas lease were "restructured" by the three agreements of February 28, 1983. We turn to that evidence.

Of telling significance is Bowers' 1982 income tax return, which was dated October 17, 1983, by his return preparer and stamped as having been received by the IRS on October 20, 1983. Schedule F of that return is concerned with "Farm Income and Expenses" for 1982, and relates exclusively to "Hickory Ridge Farm," the very farm that petitioner contends was received by Bowers in 1983 in "exchange" for his oil and gas lease. That schedule reports that Bowers received gross income from the farm in respect of hay and straw and pasture rent. On that schedule,

---

[3]The dissent in *Coupe* was primarily concerned with a question of agency, a matter not involved in the present case.

together with an attachment thereto, he claimed deductions for amounts expended in 1982 for labor, repairs, maintenance, interest, feed, machine hire, supplies, veterinary fees, taxes, insurance, utilities and telephone, agricultural consultant, small tools, advertising, office supplies, employee lodging, travel and entertainment, payroll taxes, bank charges, and business gifts—in the aggregate amount of $105,908.16. And he also claimed 1982 depreciation with respect to the farm in the amount of $25,128.25.

Plainly, Bowers would not have been entitled to any income from the farm received in 1982, nor would he have been justified in claiming deductions for the large amount of expenditures and depreciation in respect of the farm unless he had already become the equitable owner of the farm and succeeded to the benefits and burdens of ownership thereof in 1982, not in 1983 when the restructuring agreements were entered into. We must conclude from Bowers' 1982 return that he in fact did receive the farm income in 1982 reported in his return for that year, and that he or someone acting on his behalf did in fact incur the farm expenses in 1982 that were properly deducted in his 1982 return. Indeed, a number of adjustments were made in the deficiency notice in respect of some of these deductions, and as to one (interest expense) the Commissioner increased the amount allowable. As to others, some were disallowed in whole or in part, and some were left undisturbed. Petitioner has not claimed in the petition that Bowers was not the owner or operator of the farm in 1982 or that he did not make any of the expenditures involved. Moreover, the parties hereto have filed a "Stipulation of Issues" in which they settled all of these adjustments without any indication whatever of any doubt about Bowers operating a farming business on the Hickory Ridge Farm in 1982. Surely, in the language of *Coupe,* there was "substantial implementation" of Bowers' purchase of the farm in 1982, prior to the 1983 "restructuring" in the effort to create the illusion that an exchange of the lease for the farm took place.

In an attempt to show that there had not been substantial implementation, petitioner argues that "[a]fter signing its agreement with Bowers to sell Hickory Ridge, the Browne Land Trust proceeded to construct in excess of

$76,000 worth of improvements on the property." The record does not support that assertion. The stipulation of the parties refers merely to $76,713.25 improvements "constructed on the property since the July 7, 1982, purchase by the Browne Land Trust." It does not state that the Browne Land Trust made those improvements, nor does it contradict the likelihood that Bowers made the improvements or at the very least supervised and had the improvements made on his behalf either by the Browne Land Trust or someone else. In view of petitioner's burden of proof and in view of the reasonable inferences from the evidence in Bowers' 1982 return, we certainly do not accept petitioner's statement and inference that it obviously wishes us to draw that the Browne Land Trust made these improvements with its own funds and on its own behalf.

American Quasar's position in respect of the farm was merely that of a conduit in an attempt to formalize in 1983 a transfer to Bowers of a farm of which he had already acquired at least constructive ownership in 1982. He was already more than a mere constructive equitable owner of the farm when the parties went through the charade of an "exchange" of the lease for the farm in 1983.

Other aspects of this case reinforce the conclusion that we have reached in respect of the virtually sham character of the "exchange." Pursuant to the 1983 restructuring, American Quasar purported to pay the Browne Land Trust $1,148,664.19 for the farm, and in a separate agreement of the same date (February 28, 1983), it purported to undertake to pay $351,335.81 to the Browne Land Trust for improvements *to be constructed* on the farm. The total amount thus to be paid by American Quasar, namely, $1,500,000 ($1,148,664.19 plus $351,335.81) was equal precisely to the amount to be paid over to Bowers plus the further $80,000 provided for in a separate agreement to discharge its obligation in respect of the remaining $1,600,000 which it owed to Bowers.[4] However, there is nothing in the documents filed with this Court identifying the $351,335.81 improvements to be made on the farm. It is all too obvious that the $351,335.81 is nothing but a contrived figure, artificially computed to be *equal to the*

---

[4] See note 1, *supra,* as to the unexplained $20,000 discrepancy.

*penny* to the amount needed to bring the total amount to be paid by American Quasar precisely up to $1,500,000, which in turn would be paid simultaneously to Bowers as part of the final $1,600,000 balance owed by it for the lease. It staggers the imagination to think that improvements in the precise amount of $351,335.81 were contracted to be made by Bowers Land Trust in the circumstances. Moreover, American Quasar acquired at most only fleeting theoretical ownership of the farm prior to its theoretical transfer to Bowers, and it obviously didn't have the slightest interest in enforcing the obligation of the Browne Land Trust to make the improvements. Also, since the farm was theoretically to be transferred to Bowers at the same time, it would be Bowers alone who would be interested in the "obligation" to make the improvements on his own farm—an "obligation" that he could cancel at will.

We need not discuss other reasons why section 1031(a) is inapplicable in this case. For example, there were not present here "interdependent" original agreements that could be restructured as a qualifying exchange, cf. *Biggs v. Commissioner*, 69 T.C. at 914, since the original agreements of Bowers' sale of the lease to American Quasar and of his purchase of the farm from Browne Land Trust were independently enforceable. We are content to rest our decision on the ground that there was "substantial implementation" of the purchase of the farm prior to the restructuring agreements, a circumstance that precludes the application of section 1031(a). The truth is that the restructuring here was in substance nothing more than a legal fairy tale. We hold that there was no "exchange" entitled to nonrecognition under section 1031(a).

---

One final matter remains to be disposed of. The deficiency originally determined by the Commissioner for 1982 was $43,211.42. After issuance of the deficiency notice and after the filing of the answer to the petition, the IRS discovered that an error had been made in the computation of the deficiency, specifically, in the computation of the alternative

minimum tax. The Commissioner accordingly filed a motion for leave to file an amendment to the answer and sought in that amendment an increase of $8,998.15 in the deficiency for 1982. Petitioner did not object to the motion but stated that the Commissioner has the burden of proof with respect to the increase pursuant to our Rule 142(e). The Court granted the motion and the amendment to answer was filed. The matter was not thereafter dealt with in the stipulation of the parties or considered by either of them on brief.

Of course the Commissioner bears the burden of proof in respect of any increase in deficiency. But, unless there is more to the matter than has been disclosed to the Court, the increase here appears to relate solely to a computation, not calling for any "proof" by anyone. The correct amount of the deficiency should follow automatically from the arithmetic computation under Rule 155, based upon the conclusion reached above on the section 1031(a) issue and the settlement that the parties have entered into in respect of other issues in the case. There would not appear to be anything relating to the increase in deficiency calling for the production of evidence by the Commissioner. We leave it to the parties to make the correct computations.

*Decision to be entered under Rule 155.*