DENNIS A. FORTIN and ELINOR N. FORTIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fortin v. Commissioner
Docket No. 7757-87
United States Tax Court
T.C. Memo 1989-353; 1989 Tax Ct. Memo LEXIS 352; 57 T.C.M. (CCH) 1017; T.C.M. (RIA) 89353; July 24, 1989
Bradford Gorham, for the petitioners. Michael P. Breton, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1983
$ 26,558.00
--
$ 1,328.00
50% of interest
$  6,639.00
due on
$ 26,558.00
1984
45,812.00
$ 2,291.00
2,644.00
50% of interest
11,453.00
due on
$ 45,812.00
*355 After concessions, the issues are: (1) whether petitioners had unreported income during 1983; (2) whether petitioners are entitled to an additional deduction of $ 6,900 for poultry purchases made in 1983; (3) whether petitioners are entitled to additional interest expense in 1983; (4) whether respondent correctly disallowed a labor expense for 1982; (5) what is the proper year for inclusion in income of patronage dividends declared in 1984 and paid in 1987; (6) the amount and character of gain realized on the involuntary conversion of a poultry coop and its contents; (7) what is the date of disposition of section 38 property; and (8) what additions to tax, if any, are warranted. [2] The parties agree that the investment tax credit carryover, self-employment tax, and alternative minimum tax computations will be determined by the resolution of the issues herein. *356 Some of the facts have been stipulated, and the stipulation of facts and the attached exhibits are incorporated herein by reference. For convenience, we have combined our findings of fact and opinion. At the time of the filing of the petition, Mr. Fortin maintained his legal address in Greene, Rhode Island, and Mrs. Fortin maintained her legal address in Ludlow, Vermont. Petitioners were married in 1957 and divorced in 1986. They had five children born in April 1958, November 1959, November 1960, March 1962, and January 24, 1965. The burden of proof as to all issues is on petitioners. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Ewing v. Commissioner, 91 T.C. 396, 423 (1988) (additions to tax). 1983 Unreported Income
Petitioners entered the poultry business in 1976. They financed the purchase of their poultry farm and the improvements through Farmers Home Administration (FHA) and Federal Land Bank. When petitioners started their poultry business, they used the "contract method" which involves taking care of another individual's chickens and packing the eggs produced. This method proved unprofitable, and in 1981, petitioners *357 began purchasing their own chickens. Petitioners financed the purchase of the chickens through FHA. Petitioners reported gross sales of eggs of $ 520,165 and a net profit of $ 27,615 in 1983. Their gross sales of eggs, other farm income, and net profits for prior years were as follows: Gross Sales and
Net Profit
Year
Other Farm Income
or (Loss)
1976
$ 60,112     $   4,979 1977
33,000     6,684 1978
18,358     (18,552)
1979
65,019     11,974 1980
96,423     (15,068)
1981
113,851     (25,973)
1982
128,586     (22,436)
On September 2, 1983, petitioners attempted to make a cash deposit at a bank in Ludlow, Vermont, using their sons' names. Petitioners did not finalize the deposit after being advised that the bank would have to file a currency transaction report. As a preliminary matter, we note that Mrs. Fortin testified that the attempted deposit was $ 70,000, whereas Mr. Fortin testified that the attempted deposit was $ 72,000. Petitioners' testimony is contradicted by respondent who, based on the testimony of Marilyn Greenslet, the bank teller who assisted petitioners, asserts that *358 the attempted deposit was $ 75,000. On this factual dispute, we hold for respondent and find that the amount of the attempted deposit was $ 75,000. The sole question for decision is the source of this attempted deposit. Respondent asserts that it represents income earned during the period January 1 to September 2, 1983, by petitioners from the egg business. Petitioners contend that the attempted deposit represents their life savings which they had accumulated and stored over approximately 20 years in a steel box in their cellar. They testified that the attempted deposit was to facilitate their purchase of a dairy farm to take the place of the poultry farm which they planned to sell to one of their children. They also testified that they attempted to make the deposit in their sons' names to shelter assets from a pending law suit and to establish credit for their sons. Petitioners' case rests upon their testimony that they lived modestly over all the years of their marriage, that from 1976 on they lived off their poultry farm, that more than half of the money was accumulated prior to the purchase of the poultry farm in 1978, and that a substantial part of Mrs. Fortin's earnings *359 were accumulated in the form of cash. While there is no evidence of petitioners' income prior to 1976, the record does contain their Federal income tax returns from 1976 onward. These returns show practically no income other than the poultry business income prior to 1978. The returns for 1978 and subsequent years show the following earnings for Mrs. Fortin: Year
Amount
1978
$  1,463
1979
696
1980
--
1981
7,909
1982
18,184
1/1 to 9/2
1983
14,026 (2/3 of $ 21,039)
Total
$ 42,278
Respondent relies on a variety of claimed weaknesses in petitioners' testimony as to their cash accumulation to support his assertion of such omission. We are, of course, not required to accept as gospel petitioners' self-serving testimony. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Indeed, at trial, we suggested that the large amount of gross receipts from the poultry business in 1983 indicated a tempting source from which to obtain cash. However, upon further consideration and taking into account the fact that we saw and heard petitioners testify, as well as the weaknesses in that testimony to which *360 respondent points, we conclude that petitioners have carried their burden of proof as to $ 40,000, representing Mrs. Fortin's earnings during the years 1978 through 1983, but not as to the balance of the cash accumulation of $ 75,000. Consequently, respondent's determination of unreported income for 1983 is sustained to the extent of $ 35,000. $ 6,900 deduction in 1983 for purchase of poultry
The parties have stipulated to the following deductible expenses allowed by respondent for the purchase of chickens: 1983
1984
Cotanch Poultry
$ 75,000.00 $ 8,100
Clay Pullets
17,050.72 0
[3] 92,050.72 $ 8,100
An invoice from Cotanch Poultry Farms (Cotanch) reflects that, in 1983, petitioners purchased chickens for $ 144,000.00 and that petitioners were to pay $ 75,000.00 on delivery and the balance over 12 months, with interest at 13 percent. At trial, Mrs. Fortin testified that the agreed purchase price was reduced to $ 90,000 when it was discovered that some of the chickens were ill. Petitioners seek a deduction *361 of $ 6,900 for 1983 beyond the above-stipulated amount. Mrs. Fortin testified that the checks to substantiate this additional amount were destroyed in a fire which caused substantial damage to the poultry and much of the farm buildings and equipment. She also stated that she had found one check to substantiate additional payments but that she had forgotten to bring the check. Petitioners have made no effort to obtain substitute documents to verify this expense. Nor have petitioners made any effort to obtain verification through Cotanch. We, therefore, hold that petitioners have not substantiated amounts in excess of the amounts stipulated and have not carried their burden of proof. Cf. Gizzi v. Commissioner, 65 T.C. 342, 344 (1975). In light of this conclusion, we need not deal with respondent's contention that petitioners should be precluded from injecting any issue as to the $ 6,900 on the ground that it has been untimely raised. 1983 interest expense
On their 1983 Federal income tax return, petitioners claimed a deduction of $ 22,343.00 for interest expense. In their amended petition, they claimed $ 24,123.46 and, in their trial memorandum, $ 22,342.68 *362 of interest. Respondent concedes that $ 17,633.14 has been substantiated. Petitioners assert that the underlying records to substantiate the additional interest expense were destroyed in the fire. The only evidence to support this expense is an entry on a stipulated "tax organizer" reflecting a total expense of $ 22,342.68, without any breakdown of amounts or specificity as to payees. Petitioners have offered no alternative documents, such as bank statements, to substantiate these specific additional expenses. Nor does the record reflect any attempt by petitioners to obtain verification from alternative sources. We hold that petitioners have not carried their burden of proof and that only $ 17,633.14 of interest expense is deductible. Cf. Gizzi v. Commissioner, supra.
1982 labor expense
Respondent disallowed labor expenses of $ 20,960 for 1982. Respondent now concedes that a deduction of $ 13,768 is allowable but asserts that the remaining amount cannot be substantiated and is, therefore, not allowable. Petitioners assert that this disallowance is barred by the statute of limitations. However, it appears that this disallowance will affect *363 1983 items, particularly the carryover of an investment credit to 1983, an open year. To the extent that this is the case, the statute of limitations does not bar an adjustment for 1982, a closed year. It has long been held that it is proper, in determining a deficiency for an open year, to recalculate the amount of adjustments for a barred year. Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440-441 (1974), affd. without published opinion 510 F.2d 970 (3d Cir. 1975); Mennuto v. Commissioner, 56 T.C. 910, 923 (1971). Petitioners offer no proof to substantiate the additional expenses; rather, they baldly assert that because they were able to substantiate the bulk of their 1983 expenses, they should be allowed all of their claimed labor expenses for 1982. Evidence as to the amount of labor expense for 1983 is clearly insufficient to satisfy petitioners' burden of proof as to 1982. We, therefore, sustain respondent's position. Patronage Dividends
Petitioners were members of the Central Connecticut Cooperative Farmers Association Incorporated (Cooperative) during the years in issue. On January 3, 1984, the Cooperative *364 issued a check payable to Mr. Fortin or to the Cooperative in the amount of $ 8,565.45. This check was not actually received by petitioners; the amount was credited against the amount of petitioners' indebtedness to the Cooperative. Respondent's witness, Mr. Emmauelle Hirth, the manager of the Cooperative, testified that a copy of the check and a document entitled "Patronage Certificate of Indebtedness" were sent to petitioners in one envelope. Neither the original nor a copy of the actual Patronage Certificate of Indebtedness sent to petitioners was offered in evidence. [4]
Petitioners received from the Cooperative a Form 1099-PATR, Statement for Recipients (Patrons) of Taxable Distributions Received from Cooperatives, for 1984, reflecting that petitioners were entitled to receive patronage dividends of $ 42,827.23. Petitioners initially reported this amount on their 1984 Federal income tax return. They filed an amended Federal income tax return for 1984 in which they reduced this amount by $ 27,000. The stated basis for the reduction was *365 that this amount was not actually received in 1984. Petitioners received two checks in 1987, each in the amount of $ 12,941.73. Petitioners assert that their allocable share of undistributed patronage dividends, i.e., 2 X $ 12,941.73 or $ 25,883.46, is not taxable until actual receipt in 1987 because they did not receive an actual distribution in 1984 of that amount or a qualified written notice of allocation as required by section 1385(a). Section 1385(a) provides that, except as otherwise provided, each person shall include in gross income an allocated, but undistributed, patronage dividend with respect to which the person receives a qualified written notice of allocation during the taxable year. Section 1388 provides in part: (b) Written Notice of Allocation. -- For purposes of this subchapter, the term "written notice of allocation" means any capital stock, revolving fund certificate, retain certificate, certificate of indebtedness, letter of advice, or other written notice, which discloses to the recipient the stated dollar amount allocated to him by the organization and the portion thereof, if any, which constitutes a patronage dividend. (c) Qualified Written Notice of *366 Allocation. -- (1) Defined. -- For purposes of this subchapter, the term "qualified written notice of allocation" means -- (A) a written notice of allocation which may be redeemed in cash at its stated dollar amount at any time within a period beginning on the date such written notice of allocation is paid and ending not earlier than 90 days from such date, but only if the distributee receives written notice of the right of redemption at the time he receives such written notice of allocation; and (B) a written notice of allocation which the distributee has consented, in the manner provided in paragraph (2), to take into account at its stated dollar amount as provided in section 1385(a). Such term does not include any written notice of allocation which is paid as part of a patronage dividend or as part of a payment described in section 1385(c)(2)(A), unless 20 percent or more of the amount of such patronage dividend, or such payment, is paid in money or by qualified check. (2) Manner of obtaining consent. -- A distributee shall consent to take a written notice of allocation into account as provided in paragraph (1)(B) only by -- (A) making such consent in writing, (B) *367 obtaining or retaining membership in the organization after -- (i) such organization has adopted (after October 16, 1962) a bylaw providing that membership in the organization constitutes such consent, and (ii) he has received a written notification and copy of such bylaw, or (C) if neither subparagraph (A) nor (B) applies, endorsing and cashing a qualified check, paid as a part of the patronage dividend or payment of which such written notice of allocation is also a part, on or before the 90th day after the close of the payment period for the taxable year of the organization for which such patronage dividend or payment is paid. * * * (4) Qualified Check. -- For purposes of this subchapter, the term "qualified check" means only a check (or other instrument which is redeemable in money) which is paid as a part of a patronage dividend, or as a part of a payment described in section 1382(c)(2)(A), to a distributee who has not given consent as provided in paragraph (2)(A) or (B) with respect to such patronage dividend or payment, and on which there is clearly imprinted a statement that the endorsement and cashing of the check (or other instrument) constitutes the consent of the *368 payee to include in his gross income, as provided in the Federal income tax laws, the stated dollar amount of the written notice of allocation which is a part of the patronage dividend or payment of which such qualified check is also a part. Such term does not include any check (or other instrument) which is paid as part of a patronage dividend or payment which does not include a written notice of allocation (other than a written notice of allocation described in paragraph (1)(A)). * * * Initially, we note that the Form 1099-PATR constitutes an "other written notice" and is, therefore, "written notice of allocation" within the meaning of section 1388(b). It is not, however, standing alone, a "qualified written notice of allocation" (emphasis supplied) within the meaning of section 1388(c). Independent Co-op Milk Producers v. Commissioner, 76 T.C. 1001, 1018 (1981). We further note that neither the membership agreement nor the check contain specific language consenting to the inclusion of the undistributed patronage dividend in income so that neither of said documents satisfies the statutory requirements. [5]Independent Co-op Milk Producers v. Commissioner, supra at 1014. *369 Thus, we are left with the question whether the requirements of section 1388(c)(1)(B) and (c)(2)(B) are satisfied. Those provisions require that the organization have a by-law providing that membership constitutes the requisite consent and that the member has received a written notification of the adoption of the by-law and a copy thereof. That requirement is explicated in section 1.1388-1(c)(3)(ii), Income Tax Regs., which provides, in part: (ii) Consent by membership. (a) A distributee may consent to take the stated dollar amount of written notices of allocation into account under section 1385 by obtaining or retaining membership in the cooperative organization after such organization has adopted a valid bylaw providing that membership in such cooperative organization constitutes such consent, but such consent shall take effect only after the distributee has received a written notification of the adoption of the bylaw provision and a copy of such bylaw. The bylaw must have been adopted by the cooperative organization after October 16, 1962, and must contain a clear statement that membership in the cooperative organization constitutes the prescribed *370 consent. The written notification from the cooperative organization must inform the patron that this bylaw has been adopted and of its significance. The notification and copy of the bylaw shall be given separately to each member (or prospective member); thus, a written notice and copy of the bylaw which are published in a newspaper or posted at the cooperative's place of business are not sufficient to qualify a written notice of allocation under this subdivision. A member (or prospective member) is presumed to have received the notification and copy of the bylaw if they were sent to his last known address by ordinary mail. A prospective member must receive the notification and copy of the bylaw before he becomes a member of the organization in order to have his membership in the organization constitute consent. A consent made in the manner described in this subdivision shall be effective only with respect to patronage occurring after the patron has received a copy of the bylaw and the prerequisite notice and while he is a member of the organization. * * * [Emphasis supplied.] *371 Mr. Fortin signed an "Application For Membership" in Cooperative, dated February 1, 1983, which contained a provision agreeing "to abide by the rules and By-laws of said organization." The by-laws, as revised in April 1982, provide: Section 1A. Each person who hereafter applies for and is accepted to membership in this cooperative and each member of this cooperative on the effective date of this by-law who continues as a member after such date shall, by such act alone, consent that the amount of any distributions with respect to his patronage occurring on and after October 1, 1963, which are made in written notices of allocation (as defined in 26 U.S.C. 1388) and which are received by him from the cooperative, will be taken into account by him at their stated dollar amounts in the manner provided in 26 U.S.C. 1385(a) in the taxable year in which such written notices of allocation are received by him. Clearly, Cooperative had the requisite by-law. However, there is no evidence of record that petitioners were not notified of that by-law and did not receive a copy thereof. The testimony of the Fortins and Mr. Hirth was directed solely *372 to the question whether the Fortins received a notice of allocation at the time they received the Form 1099-PATR and a copy of the dividend check in January 1984. Petitioners argue on brief that there is no evidence that a "qualified notice of allocation" existed and that therefore "There is a clear failure of proof on the part of the IRS on this issue." Petitioners misconceive their responsibility to present evidence. The burden of proof was upon them to show that they were not notified of the adoption of the by-law and that they did not receive a copy thereof, and i.e., that consequently the statutory requirements were not met. This they have failed to do. Accordingly, respondent's determination that the entire $ 42,827.23 patronage dividend is includable in petitioners' 1984 income is sustained. Amount and character of gain on involuntary conversion
Petitioners received payment from their insurance company on January 24, 1984, as compensation for the fire. Petitioners discuss section 1033 at length in support of their position that the gain from the involuntary conversion was realized in 1984. Respondent agrees that the date for determining the realized gain *373 from the involuntary conversion is 1984. The parties have stipulated to the amounts realized, and the major portion of the adjusted basis, and the character of the gain. However, petitioners, in their reply brief, assert that the basis of additional items should be taken into account in computing the gain. Since petitioners offered no proof as to any increases in basis, we hold for respondent on this issue. Investment credit recapture
In 1978, petitioners purchased cage equipment which had a cost basis of $ 158,000. Petitioners claimed an investment tax credit of $ 15,800 on their 1978 Federal income tax return. Petitioners argue that the date of disposition of the property for purposes of determining the investment tax credit recapture under section 47(a) is either the date the insurance payments were made or the last date on which to acquire replacement property within the meaning of section 1033, i.e., December 31, 1986. Respondent asserts that the determinative date is the date of the destruction. We agree with respondent. The clear language of section 47(a) provides that the year used to determine the amount of the recapture is the year the property is disposed *374 of, or ceases to be section 38 property. In Webber v. Commissioner, T.C. Memo. 1983-633, affd. on other issues 790 F.2d 1463 (9th Cir. 1986), we rejected the taxpayers' argument that there was not a disposition of property within the meaning of section 47(a) where there had been an involuntary conversion and a replacement of similar property under section 1033. Similarly, we hold that, in the instant case, the property ceased to be section 38 property at the time of the fire and that the year to be used in determining the investment credit recapture is 1983. See Bremer v. Commissioner, 66 T.C. 360, 365 (1976); 8 Mertens, Law of Federal Income Taxation, sec. 32A.76 n.49 (1989).[6]
*375 Additions to tax
a. Section 6651(a)(1)
Petitioners allege that they mailed their 1984 Federal income tax return on April 15, 1985. A copy of the envelope used to mail the return reflects two illegible postmarks, a clear postmark dated April 18, 1985, and a notation that it is being returned for 7 cents additional postage. Under section 7205(a)(1), a timely mailed return is treated as timely filed. The requirements of section 7502(a)(2) must be satisfied for section 7502(a)(1) to be applicable. These requirements are that the postmark date falls within the time for filing and that the return is deposited with sufficient postage prepaid. Sec. 7502(a)(2)(A)(i) and (B); sec. 301.7502-1 (c)(1)(ii), Proced. and Admin. Regs. Further, the regulations provide that if the postmark on the envelope or wrapper is not legible, the person who is required to file the document has the burden of proving the time when the postmark was made. Sec. 301.7502-1 (c)(1)(iii)(a), Proced. and Admin. Regs. Here, the only legible postmark is dated April 18, 1985, an untimely date, and petitioners have not carried their burden that one of the illegible postmarks establishes a timely mailed *376 return. [7] Moreover, it is clear that even if there had been a timely original mailing, it would not have satisfied the requirements of "sufficient postage." [8]
b. Section 6653(a)
Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner , 85 T.C. 934, 947 (1985). Viewing the record as a whole, we find that petitioners have offered insufficient evidence to sustain a finding that their conduct was reasonable or constituted what a reasonable person would do under the circumstance. c. Section 6661
Respondent has also determined that there was a substantial understatement of income tax for the years 1983 and 1984. Petitioners' positions herein do not have the support of substantial authority and are not adequately disclosed on their returns; therefore, if the Rule 155 computation which we will direct discloses a substantial understatement, respondent may impose an addition to tax under section 6661(a). *377 Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Four other issues have been disposed of by concessions on brief: (1) The parties agree that the amount of allowable labor expense for 1983 is $ 34,124.33; (2) respondent concedes the depreciation deductions for 1983 disallowed in its notice of deficiency; (3) the parties also agree on the amount of depreciation deductions for 1984; and (4) petitioners agree with respondent that the deductions for feed expense and supply expense for 1983 are $ 330,534.33 and $ 44,953.98, respectively.↩
3. We note the actual figure used in the stipulation is $ 92,050.17; however, this figure is clearly a clerical mistake.↩
4. Respondent offered through Mr. Hirth a blank form of Patronage Dividend Certificate which the Court declined to receive in evidence.↩
5. In view of this conclusion, we have no need to consider whether the endorsement requirement in respect of a qualified check has been satisfied under the circumstances herein.↩
6. At a time prior to the taxable years at issue, section 47(a) of the Internal Revenue Code, a casualty did not trigger recapture of the investment credit. This provision was repealed in 1971 by sec. 107(a), Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 507; such repeal has the "effect of treating casualties and thefts as dispositions and, thus, subjecting all dispositions to the recapture rules." S. Rept. 92-437 (1971), 1972-1 C.B. 559, 583; H. Rept. 92-533 (1971), 1972-1 C.B. 498↩, 513.
7. See Hydrudko v. Commissioner, T.C. Memo. 1982-139↩. 8. See Fawcett v. Commissioner, T.C. Memo. 1985-214↩.