THOMAS E. WYNECOOP AND SHIRLEY WYNECOOP, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3765–79.     Filed January 19, 1981.

*John Ranquet*, for the petitioners.
*Thomas N. Tomashek*, for the respondent.

OPINION

FEATHERSTON, *Judge*: Respondent determined deficiencies in the amounts of $126,912.94 and $79,609.48 in petitioners' Federal income taxes for 1975 and 1976, respectively. Due to a concession by respondent, the only issue for decision is whether certain

dividends received by petitioner Thomas E. Wynecoop are exempt from Federal income taxation.

This case was submitted fully stipulated.

Petitioners Thomas E. Wynecoop (hereinafter referred to as petitioner) and Shirley Wynecoop, husband and wife, filed joint Federal income tax returns for 1975 and 1976 with the Internal Revenue Service Center, Ogden, Utah. At the time the petition was filed, they resided in Redmond, Wash.

Petitioner was born on the Spokane Indian Reservation (the reservation) on March 21, 1928. At all times pertinent herein, he was an enrolled member of the Spokane Indian Tribe (the tribe).

On June 9, 1954, petitioner and several of his relatives, also enrolled members of the tribe, were granted a permit to prospect for minerals on certain tribal lands. In the event that metal or ore were found in paying quantities, the permit required the permittees to enter into a mineral lease "as provided by the regulations of the Department of the Interior for Tribal Lands." On or about October 1, 1954, a mining lease was entered into between the U.S. Department of Interior, Bureau of Indian Affairs, on behalf of the tribe, as lessor, and petitioner and his relatives, as lessees.

On or about December 10, 1954, petitioner and his relatives, in conjunction with nine other incorporators, formed Midnite Mines, Inc. (Midnite). In exchange for stock of this new corporation, petitioner and his relatives assigned to it their lessees' interests in the October 1, 1954, mining lease.

On April 20, 1955, Midnite entered into an agreement with a second corporation, Newmont Mining Co. (Newmont), under which a third corporation known as Dawn Mining Co. (Dawn) was organized. Pursuant to the agreement, Midnite received (and at the time of the stipulation, held) 147,000 shares of Dawn's stock (49 percent) in exchange for the assignment to Dawn of its lessee's interest in the mining lease with the tribe. Newmont received (and at the time of the stipulation, held) 153,000 shares of Dawn's stock (51 percent) in exchange for $153,000 in cash and its agreement to loan Dawn whatever funds were necessary to develop mines on the leased land and build a processing mill for processing the ore taken therefrom.

Subsequently, Newmont loaned Dawn funds to purchase land (not on the reservation) and build a uranium processing mill thereon. Newmont also loaned Dawn funds to acquire a lease,

approved by the Department of the Interior, to mine certain land (the Boyd land) located on the reservation that was not owned by the tribe in common. The Boyd land had been allotted to several individual Spokane Indians by the Federal Government and was held by the legal heirs of those original allottees.[1]

From the date of its formation through 1975 and 1976, except for small amounts of interest income, Dawn's income was derived entirely from the sale of uranium that was mined from the parcels of land leased from the tribe and the Boyds. Further, except for insignificant amounts of interest income, Midnite's only source of income during the same period was distributions from Dawn.

During 1975 and 1976, petitioner received dividends from Midnite in the respective amounts of $284,388.75 and $169,881.92. On his 1975 and 1976 income tax returns, petitioner included a note disclosing the receipt of these distributions from Midnite. However, he failed to include any portion of the distributions in his income for those years, stating that it was his position that the distributions received from Midnite were exempt from tax.[2] On audit, respondent determined that the distributions were includable in petitioner's taxable income.

The Internal Revenue Code broadly provides that the income of *every* individual, from *whatever* source derived, is subject to the Federal income tax. Secs. 1[3] and 61. Accordingly, the income of Indians, as well as other individuals, is taxable "unless an

---

[1] See the Indian General Allotment Act of 1887, ch. 119, 24 Stat. 388, 25 U.S.C. sec. 331 et seq. Under this act, as amended, Indians were to be allotted up to 160 acres of grazing land or 80 acres of agricultural land on their reservations. The land so allotted was to be held in trust by the United States, for the sole use and benefit of the Indian allottees, for a period of 25 years (longer in the discretion of the President). At the end of the trust period, the land was to be conveyed to the allottees, "in fee, discharged of said trust and free of all charge or incumbrance whatsoever." See also the Indian Reorganization Act of 1934, ch. 576, sec. 2, 48 Stat. 984, 25 U.S.C. sec. 462, which provides: "The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress."

We note that it is not clear from the record whether the Boyd land was allotted pursuant to the provisions of the Indian General Allotment Act of 1887 or under the provisions of some other statute or treaty.

[2] On his tax returns, petitioner denied that the distributions from Midnite constituted dividends to him. On brief, he concedes that the distributions would be taxable as dividends, under sec. 301, were it not for the source of the funds and his status as an enrolled member of the tribe.

[3] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

exemption from taxation can be found in the language of a Treaty or Act of Congress." *Commissioner v. Walker*, 326 F.2d 261, 263 (9th Cir. 1964), affg. in part and revg. in part 37 T.C. 962 (1962), and cases cited therein; *Jourdain v. Commissioner*, 71 T.C. 980, 987 (1979), affd. 617 F.2d 507 (8th Cir. 1980).

Petitioner has not referred us to, nor have we found, any treaty or statute that would, by its terms, exempt the amounts in question from Federal taxation. Nonetheless, relying on the cases of *Squire v. Capoeman*, 351 U.S. 1 (1956), and *Stevens v. Commissioner*, 452 F.2d 741 (9th Cir. 1971), affg. in part and revg. in part 52 T.C. 330 (1969), Supplemental Opinion 54 T.C. 351 (1970), petitioner contends that the dividends are exempt because he is an enrolled member of the tribe, and the dividends can be traced to proceeds from the sale of uranium that was mined from land located on the reservation. In this connection, he argues that, due to the guardian-ward relationship that exists between the U.S. Government and noncompetent Indians,[4] denial of an exemption with respect to the dividends would "in effect cause the Government to breach its trust" to petitioner as a noncompetent ward.[5]

We find petitioner's arguments to be without merit. In *Jourdain v. Commissioner*, 71 T.C. at 986–987, we specifically held that the theory of the guardian-ward relationship is not determinative of the taxability of income received by an Indian.

---

[4] The term "noncompetent Indian," as used in cases such as the one at bar, refers to one who has been allotted land that is held in trust for him by the United States and who, therefore, may not alienate or encumber that land without the consent of the United States. The term does not denote mental incapacity. See *Stevens v. Commissioner*, 452 F.2d 741, 742 n. 1 (9th Cir. 1971), affg. in part and revg. in part 52 T.C. 330 (1969), Supplemental Opinion 54 T.C. 351 (1970).

Petitioner argues that, because he is an enrolled member of the tribe, he is "noncompetent" as a matter of law. However, the stipulation does not disclose whether petitioner has ever been the recipient of an allotment on the reservation, and we are not persuaded that the status of being a noncompetent Indian necessarily follows from enrollment as a member of an Indian tribe. In any event, for purposes of this opinion, we assume that petitioner is a noncompetent Indian. Compare *Brunt v. Commissioner*, 5 B.T.A. 134, 135 (1926).

[5] For a general discussion of the guardian-ward relationship referred to here, and a case relying on that relationship as the basis for finding an Indian's income to be exempt from taxation, see *Walker v. Commissioner*, 37 T.C. 962, 967–971 (1962), revd. in part and affd. in part 326 F.2d 261 (9th Cir. 1964). See also *Brunt v. Commissioner*, *supra*. But see *Jourdain v. Commissioner*, 71 T.C. 980, 986–987 (1979), a Court-reviewed opinion, affd. 617 F.2d 507 (8th Cir. 1980), where this Court (as noted in the text, *infra* ) stated that:

"We no longer believe this reasoning [in our opinion in *Walker* ] is valid and we hold that the theory of the guardian-ward relationship upon which we relied in *Walker* is no longer a consideration in the tax status of Indians."

Furthermore, it is clear that petitioner's reliance on the decisions in *Squire* and *Stevens* is misplaced.

In *Squire*, the taxpayer, a noncompetent Indian, had been allotted land on his tribe's reservation pursuant to the provisions of the Indian General Allotment Act of 1887, ch. 119, 24 Stat. 388, 25 U.S.C. sec. 331 et seq. The act contemplated that, upon the termination of a period during which the allotted land was to be held in trust by the United States for the taxpayer, the land was to be conveyed to him in fee, "free of all charge or incumbrance whatsoever."[6] The Supreme Court held that the promise of the United States to transfer the fee "free of all charge or incumbrance" required that capital gain realized by the taxpayer from the sale of timber taken from the allotted land held in trust for him be exempt from Federal income tax. The rationale underlying the decision was that taxing an Indian's allotted land or the income derived from it would violate the Government's promise to transfer the fee to the allottee "free of all charge or incumbrance whatsoever." See *Critzer v. United States*, 220 Ct. Cl. 43, 597 F.2d 708, 712 (1979), cert. denied 444 U.S. 920 (1979); *United States v. Anderson*, 625 F.2d 910, 914 (9th Cir. 1980).

*Stevens v. Commissioner, supra*, involved the question of a noncompetent Indian's taxability on income derived from farming and ranching operations conducted on allotted lands. Relying on the holding of the Supreme Court in *Squire*, the U.S. Court of Appeals for the Ninth Circuit held in part that such income was exempt from Federal taxation even though the allotted land, title to which was held in trust for the taxpayer by the United States, had been acquired by purchase from the original allottee and not by allotment.

Petitioner argues that he derived income from the lease of tribal and allotted land, as a result of his ownership of stock in Midnite, and that the income so derived is analogous to the income that was derived from the allotted land acquired by purchase in *Stevens*. However, in both *Squire* and *Stevens*, the income held to be exempt from tax was derived directly[7] from

---

[6] See note 1 *supra*.

[7] See *Fry v. United States*, 557 F.2d 646 (9th Cir. 1977), cert. denied 434 U.S. 1011 (1978), and *Critzer v. United States*, 220 Ct. Cl. 43, 597 F.2d 708 (1979), cert. denied 444 U.S. 920 (1979), both dealing with the requirement that, to be exempt under *Squire*, income must be derived

allotted land in which the noncompetent Indian taxpayer had a beneficial *ownership* interest.[8] The purpose of the exemption in each case was to ensure that the taxpayer would receive "unencumbered" land when the fee was transferred to him by the United States. It was not intended to benefit him simply because he was an Indian. *Fry v. United States*, 557 F.2d 646, 649 (9th Cir. 1977), cert. denied 434 U.S. 1011 (1978). Nor was it intended to benefit him simply because the income was derived from land located on an Indian reservation.

Indeed, in *Stevens*, this Court held taxable the income derived from raising cattle on both the land of individual allottees and tribal land that was being used by the taxpayer pursuant to grazing permits.[9] We did so on the authority of *Holt v. Commissioner*, 44 T.C. 686 (1965), affd. 364 F.2d 38 (8th Cir. 1966), cert. denied 386 U.S. 931 (1967), where we had held that a noncompetent Indian who raised cattle on tribal lands used by authority of a grazing permit was taxable on the income he received from that activity. *Stevens v. Commissioner*, 52 T.C. at 339.

The Court of Appeals for the Ninth Circuit, to which appeal in this case would lie, was recently faced for the first time with the question of the taxability of a noncompetent Indian on income derived from the allotted land of other Indians and from tribal land. *United States v. Anderson, supra.* The income at issue had been derived from land used pursuant to a grazing permit. The court held, in broad terms, that the tax exemption construed in *Squire* and relied on in *Stevens* does not apply to the income a noncompetent Indian derives from the "trust land" of other Indians or his tribe.

---

directly from the land.

Respondent argues that the income in this case was not derived directly from the land because it passed through two corporations (Dawn and Midnite) before the petitioner received it. Petitioner argues, in effect, that the corporations were mere conduits through which the proceeds from the sale of uranium passed directly to him. While we tend to agree with respondent (see *Moline Properties v. United States*, 319 U.S. 436 (1943)), our conclusion remains the same even if we assume that the income was derived directly from the land, as if petitioner were the lessee.

[8] In *Holt v. Commissioner*, 364 F.2d 38, 41 (8th Cir. 1966), affg. 44 T.C. 686 (1965), cert. denied 386 U.S. 931 (1967), the Court pinpointed the crucial facts in *Squire* as follows: "In that case, the land producing the income had been specifically allotted to the taxpayer. He had a definite interest in particular land."

[9] The taxpayer in *Stevens* did not appeal this Court's decision with respect to the land used under the grazing permits.

For the purposes of resolving the issue here presented, we perceive no basis for distinguishing between income derived from land used pursuant to a grazing permit and income derived from land used under a mineral lease. In either case, taxation of a noncompetent Indian's individual profit derived from the lease of tribal or allotted land does not represent a charge or encumbrance upon the tribe's or allottee's ownership interest in such land within the meaning of *Squire* and *Stevens*. *United States v. Anderson, supra* at 914–915; *Holt v. Commissioner*, 364 F.2d at 41. Accordingly, we hold that the dividends that petitioner received from Midnite during 1975 and 1976 are taxable to him.

To reflect the foregoing,

*Decision will be entered under Rule 155.*