150 T.C. No. 6

UNITED STATES TAX COURT

ALICE PERKINS AND FREDRICK PERKINS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28215-14.                    Filed March 1, 2018.


Ps claimed that income they earned from selling gravel mined from Seneca Nation land was exempt from tax under the General Allotment Act, the Canandaigua Treaty, and the Treaty of 1842 because the income was derived from Indian land. R adjusted Ps' income to include the gravel income. R also determined that Ps were liable for additions to tax and penalties under I.R.C. sections 6651(a)(1) and 6662(a).

<u>Held</u>: Income earned from selling gravel mined from Seneca Nation land is taxable income that is not excluded by either treaty or by the General Allotment Act.

<u>Held</u>, <u>further</u>, Ps are liable for additions to tax under I.R.C. section 6651(a)(1).

<u>Held</u>, <u>further</u>, Ps may not be liable for penalties under I.R.C. section 6662(a).

Gary Dennis Borek, for petitioners.

Mark Alexander Ericson, for respondent.


OPINION


HOLMES, Judge:  Alice Perkins is an enrolled member of the Seneca Nation, which has been and remains the largest Indian nation within the Iroquois Confederacy and the largest population of Indians in western New York.[1]  Perkins and her husband live on Seneca property and got permission from the Nation's government to mine and sell gravel during 2008 and 2009.  They argue that their income from these sales is exempt from federal taxation under the terms of several treaties signed when the United States were in their infancy, which the Perkinses say promise that the federal government won't tax members of the Seneca Nation

---

[1] Nomenclature is fraught in this field.  The Senecas refer to themselves in their own language as the O-non-dowa-gah.  Their government strongly prefers to be called a nation rather than a tribe, and the official name of the Nation in English is the "Seneca Nation of Indians."  See Seneca Nation of Indians, https://sni.org (last visited Sept. 12, 2017); Seneca Nation of Indians FAQ, https://sni.org (last visited Sept. 12, 2017).

The Nation's own website is agnostic on the question of referring to Senecas as "Indians" or "Native Americans."  See Seneca Nation of Indians FAQ.  Much of the literature in this area refers to "Indian law" and "Indian treaties" and the like, however; so to maintain some continuity with this legal-historical past, we will use the traditional nomenclature, but we will use "Nation" when we refer to the Senecas' government and collective term for themselves in English.

on this kind of income. Both parties are before the Western District of New York in an essentially identical refund case, and the Perkinses recently won the argument there, withstanding the Government's motion to dismiss. See Perkins v. United States, No. 16-CV-495(LJV), 2017 WL 3326818 (W.D.N.Y. Aug. 4, 2017).

The Commissioner nevertheless argues that we have dealt with this issue many times before and there's no tax exemption to be found. He thinks this case is ripe for summary judgment.

## Background

Alice Perkins and her husband Fredrick live on the Allegany Territory of the Seneca Nation. In 1985 Alice began a trucking business called A&F Trucking. The Perkinses' tax returns suggest Fredrick worked for the company as a truck driver.

The record doesn't tell us all the services A&F Trucking performed, but it does show that the Perkinses were interested in mining gravel on the Nation's land. This meant they had to win permission from the Nation's Council. Alice won that permission for A&F Trucking in 2008. No one disputes that she mined and sold the gravel in both 2008 and 2009. In June 2009 the Nation withdrew the permit, but the business had piled up enough gravel to continue to sell it into 2010.

The record does not tell us how much gravel was dug up or who bought it, but the Perkinses' tax returns show that the business had almost $1.5 million in gross receipts from 2008 and nearly $1.7 million from 2009.

The Perkinses didn't file their 2008 and 2009 tax returns until October 2011, which means both returns were late. The Perkinses attached a "detail sheet" to each return that said the income from the gravel was from "Native American land not subject to federal income taxes." On disclosure statements, they explained:

> The taxpayer is claiming that the revenue from gravel income earned from the depletion of his land is not subject to federal income tax[.] The US Tax Court concluded that a federal income tax exemption was created by the Indian General Allotment Act of 1887 ch 119 for income that an individual Indian allottee derives directly from the land held in trust for him citing Squire v. Capoeman * * * [Spelling corrected.]

The Commissioner soon showed up to dispute this claim. In August 2014 he sent the Perkinses a notice of deficiency for their 2008 through 2010 tax years. He said that the gravel income was taxable and that he would impose penalties under sections 6651(a)(1) and 6662(a).[2]

---

[2] All section references are to the Internal Revenue Code in effect for 2008 and 2009, and all Rule references are to the Tax Court Rules of Practice and Procedure unless we say otherwise.

The Perkinses responded by filing a Tax Court petition for their 2008 and 2009 tax years.[3]  During discovery, the Perkinses sent an email to the IRS stating that their argument was now based on two treaties--the Canandaigua Treaty, Nov. 11, 1794, 7 Stat. 44,[4] and the Treaty with the Seneca, May 20, 1842, 7 Stat. 586 (1842 Treaty).  The Commissioner saw his chance and moved for summary judgment on the issues of whether the gravel income is taxable and whether the Perkinses should pay penalties.

For their 2010 tax year the Perkinses paid the alleged deficiency and filed a refund suit in U.S. District Court.  See Perkins v. United States, 119 A.F.T.R.2d (RIA) 2017-595 (W.D.N.Y. 2017).  After some pretrial maneuvering, the Government in that case made the same argument that the Commissioner makes here--that neither the Canandaigua Treaty nor the 1842 Treaty exempts the Perkinses' gravel-sales income from federal taxation.  Id. at 2017-596.  Magistrate Judge Scott of the Western District of New York issued a report and recommendation that the

---

[3] The Commissioner initially disputed a number of other items in the notice of deficiency, but the only argument the Perkinses made in their petition was that the gravel wasn't taxable and they shouldn't have to pay penalties.  That means that we deem the other items in the notice of deficiency conceded by the Perkinses under Rule 34(b)(4).

[4] The Canandaigua Treaty is also known as the Treaty of the Six Nations, which is the name some courts use.  See, e.g., Sylvester v. Commissioner, T.C. Memo. 1999-35, 1999 WL 49773, at *2 n.3.

District Court deny the Government's motion to dismiss based on the Canandaigua Treaty but grant its motion based on the 1842 Treaty. Id. at 2017-600 to 2017-601. Both parties objected, see Fed. R. Civ. P. 72, and District Judge Vilardo very recently adopted Judge Scott's recommendation about the Canandaigua Treaty but rejected his recommendation about the 1842 Treaty, Perkins, 2017 WL 3326818, at *1. He denied the Government's motion to dismiss. Id. at *5.

This presents an unusual opportunity for two courts to analyze the same question about the same taxpayers at the same time.

## Discussion

We begin with some general principles. We may grant summary judgment when there's no genuine dispute of material fact and a decision may be rendered as matter of law. Rule 121(b); see, e.g., Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). There is no genuine dispute of material fact here, so we may move straight to the law.

The relevant law begins with a reminder that American Indians have all been American citizens since 1924. Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253. Federal tax law applies to every American, including Indians and their property interests. Fed. Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 116-17 (1960); Commissioner v. Walker, 326 F.2d 261, 263 (9th Cir. 1964), aff'g

in part, rev'g in part 37 T.C. 962 (1962).  The Code taxes "every individual" on "all income from whatever source derived," see secs. 1(a)-(c), 61(a), unless the income is specifically excluded, see generally ch. 1, subch. B, p. III, Items Specifically Excluded From Gross Income.  Indians are subject to the tax law just like other Americans unless there's a specific exclusion in a treaty or statute.  Squire v. Capoeman, 351 U.S. 1, 6 (1956); Superintendent of Five Civilized Tribes, for Sandy Fox, Creek No. 1263 v. Commissioner, 295 U.S. 418, 421 (1935).

History does affect how we construe those exceptions.  The normal maxims --cited almost every day our Court releases opinions--that deductions "are a matter of legislative grace," see, e.g., Indep. Coop. Milk Producers Ass'n v. Commissioner, 76 T.C. 1001, 1014 (1981), and that exemptions from tax are strictly construed, see, e.g., McCamant v. Commissioner, 32 T.C. 824, 834 (1959), are displaced a bit when Indians are involved.  We construe treaties and statutes in favor of Indians because courts have viewed Indians as being in a more vulnerable position in relation to the United States government.  See Choate v. Trapp, 224 U.S. 665, 675 (1912) ("The construction, instead of being strict, is liberal; doubtful expressions * * * are to be resolved in favor of [the Indians]").  "Generally, treaties are construed more liberally than private agreements and the history, negotiations, and practical construction adopted by the parties are all relevant to treaty interpreta-

tion. Moreover, Indian treaties 'are to be construed, so far as possible, in the sense in which the Indians understood them.'" Seneca Nation of Indians v. New York, 382 F.3d 245, 259 (2d Cir. 2004) (quoting Choctaw Nation of Indians v. United States, 318 U.S. 423, 432 (1943)). Still, we can't use this canon "to create favorable rules" for them. Jourdain v. Commissioner, 671 T.C. 980, 990 (1979), aff'd, 617 F.2d 507 (8th Cir. 1980). With these constraints in mind, we turn to the parties' arguments.

We start with the Perkinses' return position. On their returns, the Perkinses reported their income but in an explanatory attachment denied it was taxable under the General Allotment Act of 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. secs. 334, 339, 341, 342, 348, 349, 354, 381 (2012)).[5] As the Perkinses later recognized, however, the General Allotment Act specifically exempted "the

---

[5] The General Allotment Act divided reservations into parcels and held the "allotments" in trust for individual Indians. General Allotment Act of 1887, ch. 119, secs. 1-5, 24 Stat. at 388-390; United States v. Anderson, 625 F.2d 910, 912 (9th Cir. 1980). After the statutory trust period ended, allottees got their land "in fee, discharged of said trust and free of all charge or incumbrance whatsoever." General Allotment Act sec. 5, 24 Stat. at 389; see 25 U.S.C. sec. 348 (2012); Squire v. Capoeman, 351 U.S. 1, 3 (1956); Stevens v. Commissioner, 452 F.2d 741, 745 (9th Cir. 1971), aff'g in part, rev'g in part 54 T.C. 351 (1970) and 52 T.C. 330 (1969). Also at that time "all restrictions as to sale, incumbrance, or taxation of said land * * * [were] removed." 25 U.S.C. sec. 349 (2012). Congress likely assumed the Act would bring about the end of the reservation system, although the more direct goal was to promote assimilation. Hagen v. Utah, 510 U.S. 399, 424-25 (1994) (Blackmun, J., dissenting).

reservations of the Seneca Nation of New York Indians in the State of New York."
See id. sec. 8, 24 Stat. at 391.  That exemption remains in effect to this day.  See
25 U.S.C. sec. 339.[6]  We agree with the Commissioner--and now even the
Perkinses--that this Act doesn't apply to the Perkinses and does not excuse them
from paying tax on the income they earned selling gravel.

The Perkinses realized this during the audit and raised some new arguments
based on the Nation's treaties with the Federal Government.  The first of these is
the Canandaigua Treaty.  The Perkinses focus our attention on the part of the
treaty that says:

> [T]he United States will never claim the * * * [Seneca Nation's
> Treaty-defined lands], nor *disturb* the Seneka Nation, nor any of the
> Six Nations, or of their Indian friends residing thereon and united
> with them, in *the free use and enjoyment thereof*: but it shall remain
> theirs, until they choose to sell the same to the people of the United
> States, who have the right to purchase.

Canandaigua Treaty, art. III, 7 Stat. at 45 (emphasis added).  The Perkinses argue
that the guaranty not to "disturb * * * the free use and enjoyment" of the Seneca
Nation's land includes a tax exemption for income derived directly from the land.

---

[6] The Seneca Nation vehemently opposed allotment of tribal lands.  See
Laurence M. Hauptman, "Senecas and Subdividers:  Resistance to Allotment of
Indian Lands in New York, 1875-1906", 9 Prologue:  The Journal of the National
Archives 105 (1977).

The first question here is whether this treaty even provides rights to individual Indians, rather than to the Nation as such. Focus on this passage: "[T]he United States will never claim the * * * [Seneca Nation's Treaty-defined lands], nor disturb the Seneka nation, nor any of the Six Nations, or of their Indian friends residing thereon and united with them, in the free use and enjoyment thereof." Id.

The District Court read the phrase "or of their Indian friends residing thereon" as creating rights for the Perkinses themselves. Perkins, 2017 WL 3326818, at *4. We must respectfully disagree--the phrase is part of a list that includes the Nation and any of the other nations of the Iroquois Confederacy. We don't think that the phrase "or of their Indian friends residing thereon and united with them" can reasonably be read as creating personal rights--the class of "Indian friends" being limited to those "friends" who have become "united" with one of the Iroquois nations.

This Court has consistently rejected the argument that the Canandaigua Treaty creates a tax exemption for individual members of the constituent nations of the Iroquois Confederacy. See Sylvester v. Commissioner, T.C. Memo. 1999-35, 1999 WL 49773, at *2-*3; Maracle v. Commissioner, T.C. Memo. 1991-98, 61 T.C.M. (CCH) 2083, 2084 (1991); George v. Commissioner, T.C. Memo. 1989-

401, 57 T.C.M. (CCH) 1168, 1168-69 (1989); Nephew v. Commissioner, T.C. Memo. 1989-32, 56 T.C.M. (CCH) 1122, 1123 (1989); see also Lazore v. Commissioner, 11 F.3d 1180, 1182, 1187 (3d Cir. 1993) (finding that the Canandaigua Treaty did not exempt wages earned by members of the Mohawk Nation--another party to the Canandaigua Treaty), aff'g in relevant part T.C. Memo. 1992-404, 1992 WL 163978.

By its express terms, the treaty protects the Seneca Nation's lands from being "disturbed", which is different from creating a tax exemption. The rest of that sentence--"it shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase"--doesn't make sense as a tax-exemption provision, but makes perfect sense as a restriction on alienation of the Nation's lands. The inclusion of "Indian friends residing thereon and united with them" means that the Nation gets to choose who is a member of the Nation and perhaps even can be seen as a promise not to use non-Seneca Indians as putative sellers of Seneca land.

The Court of Federal Claims has also analyzed this particular provision in the Canandaigua Treaty and held that excise taxation does not prevent "free use and enjoyment" by Indians. Cook v. United States, 32 Fed. Cl. 170, 174-75 (1994). This is also how the Supreme Court has construed similar language in

other Indian treaties.  See Superintendent of Five Civilized Tribes, 295 U.S. at 421 ("Non-taxability and restriction upon alienation are distinct things").  The Eighth Circuit has likewise held that the promise that land would be free of "molestation from the United States" meant free from "interference with the rights of Indians to hunt and otherwise enjoy their land, *not the 'right' to be free from federal taxation*."  Jourdain, 617 F.2d at 508-09 (emphasis added) (discussing the Treaty of Greenville, Aug. 3, 1795, 7 Stat. 49).  And we have ourselves held that a treaty reserving "the right of taking fish, at all usual and accustomed grounds and stations" didn't create a tax exemption for income derived by using the rights guaranteed by the treaty.  Earl v. Commissioner, 78 T.C. 1014, 1017-18 (1982) (quoting the Treaty of Medicine Creek, Dec. 26, 1854, 10 Stat. 1132).

But the Perkinses argue there's more under the surface in this case.  They point out that previous cases that analyzed the Canandaigua Treaty arose from challenges by individual Iroquois to the taxation of income from *wages* or similar types of income.  They say that their income was different because it was derived from the Nation's *land*.  The District Court agreed.  See Perkins, 2017 WL 3326818, at *3.  The Perkinses argue that this changes everything, and they cite several cases that speculated in *dicta* that the Canandaigua Treaty "*might* create an exemption from taxation on income derived directly from the land."  Lazore, 11

F.3d at 1185 (emphasis added) (discussing <u>Hoptowit v. Commissioner</u>, 709 F.2d 564 (9th Cir. 1983)); <u>Sylvester</u>, 1999 WL 49773, at *2-*3 (noting "that none of petitioner's income was *derived directly or indirectly from the use of Indian land*" in ruling that the income wasn't exempt under the Canandaigua Treaty) (emphasis added)). Neither court explained what part of the treaty or caselaw led it to make these comments.

We can sort out this issue by going back to <u>Capoeman</u>. The Supreme Court in <u>Capoeman</u>, 351 U.S. at 8-9, held that the General Allotment Act created an exemption for "income derived directly" from land if the land is allotted and still held in trust. Of course, the parties agree that the General Allotment Act doesn't directly apply to the Perkinses, but the Perkinses seem to argue there's a general exemption--or perhaps a presumption of some sort--for exempting all income derived from Indian land.

But <u>Capoeman</u> did not create a general exemption for all income derived from land. An applicable exemption from taxation in a treaty or statute is still required. <u>Capoeman</u>, 351 U.S. at 6 ("Indians are citizens and * * * in ordinary affairs of life, not governed by treaties * * *, they are subject to the payment of income taxes as are other citizens. * * * [T]o be valid, exemptions to tax laws should be clearly expressed"). The Ninth Circuit stretched <u>Capoeman</u> to include

income derived directly from land that has been *allotted* under *any other act with similar language* to the General Allotment Act.  Stevens v. Commissioner, 452 F.2d 741 (9th Cir. 1971), aff'g in part, rev'g in part 54 T.C. 351 (1970) and 52 T.C. 330 (1969).

Still, the "Capoeman exemption applies only to income derived from *allotted* land."  Jourdain, 617 F.2d at 508 (emphasis added).  The exemption was intended to ensure Indians received "unencumbered" land when it was released from trust and became the property of the Indian who received the allotment. Wynecoop v. Commissioner, 76 T.C. 101, 106 (1981).  It was not intended to benefit Indians "simply because the income was derived from land located on an Indian reservation."  Id.  And courts before the District Court's recent opinion have consistently held that income derived from common tribal land--as opposed to allotted land--is taxable.  Anderson, 625 F.2d at 914 (income from cattle ranching under a tribal license was taxable); Fry, 557 F.2d at 648 (income from logging on reservation land was taxable); Wynecoop, 76 T.C. at 107 (dividends from stock received in exchange for mineral leases of tribal lands were taxable); see also Holt, 364 F.2d at 41-42; Earl, 78 T.C. at 1019; Jourdain, 71 T.C. at 989; Tonasket v. Commissioner, T.C. Memo. 1985-365, 50 T.C.M. (CCH) 489, 492 (1985).

The land here wasn't allotted to the Perkinses. "Allotted" means land set aside in trust for individual Indians, in contrast to land held by the Nation. See, e.g., Capoeman, 351 U.S. at 3. The Perkinses admitted that the "[g]ravel at [i]ssue was taken from land that was part of the common lands recognized by federal treaties to be the territories of the Seneca Nation." They also admitted that the "gravel at issue was not taken from land that was allotted to petitioner-husband during 2008 and 2009." The Perkinses wouldn't admit or deny whether the gravel was taken from land allotted to Alice, but if the gravel was taken from common land, it couldn't have been specifically allotted to Alice.

The District Court refers to Capoeman but does not discuss its analysis of the distinction between allotted and tribal lands or the taxability of income from each. We therefore must again respectfully disagree with its holding. We hold instead that the Canandaigua Treaty doesn't exempt the Perkinses from paying taxes on the gravel income.

The Perkinses also say we should understand the Canandaigua Treaty in light of how the Seneca Nation understood it. See Jones v. Meehan, 175 U.S. 1, 11 (1899). Citing Lazore, 11 F.3d at 1186, the Perkinses argue that the Iroquois understanding of the Canandaigua Treaty was embodied in the "Two Row Wampum," a belt consisting of "two parallel rows of dark colored beads on a

background of lighter colored beads" signifying "two peoples * * * coexisting peacefully, neither imposing their laws or religion on the other."[7]  Like the court in Lazore, however, "we are constrained from finding an exemption in the absence of some textual support."  Id. at 1187.  The Two Row Wampum does not provide this required support.[8]

We now turn to the 1842 Treaty.  The Perkinses cite the following portion of its text:

> to protect such of the *lands* of the Seneca Indians, within the State of New York, as may from time to time remain in their possession *from*

---

[7] As the Perkinses point out, the Iroquois used wampum belts--belts made from strings of shells or beads--to memorialize agreements.  See, e.g., Colin G. Calloway, "Treaties and Treaty Making", in The Oxford Handbook of American Indian History 539, 541 (Frederick E. Hoxie ed., 2016).  The Two Row Wampum initially commemorated a 17th-century agreement between the Iroquois and the Dutch.  Lazore v. Commissioner, 11 F.3d 1180, 1186 (3d Cir. 1993), aff'g in part T.C. Memo. 1992-404.  In Lazore, the court heard testimony explaining that in the Iroquois' view, the principles of the Two Row Wampum "were the basis for treaties with France, Great Britain, and the United States, including the Treaty of Canandaigua."  Id.

[8] Although neither the Perkinses nor Lazore discusses it, we note that George Washington had a specific wampum belt made to commemorate the Canandaigua Treaty.  See, e.g., Richard W. Hill, Sr., "Linking Arms and Brightening the Chain:  Building Relations Through Treaties", in Nation to Nation:  Treaties Between the United States and American Indian Nations 37, 56 (Suzan Shown Harjo ed., 2014).  That belt shows two figures under the roof of a longhouse linking arms with thirteen figures that represent the original States.  Id.  This wampum belt, however, also does not give us the textual support we need to find a tax exemption.

*all taxes*, and assessment for roads, highways, or *any other purpose* until such lands shall be sold and conveyed by the said Indians, and the possession thereof shall have been relinquished by them.

1842 Treaty, art. 9, 7 Stat. at 590 (emphasis added).[9] The Perkinses argue that this treaty explicitly provides a tax exemption for income derived from the use of tribal land. The Second Circuit has held that the 1842 Treaty "clearly prohibit[s] only the taxation of real property." United States v. Kaid, 241 F. App'x 747, 750 (2d Cir. 2007) (citing Snyder v. Wetzler, 603 N.Y.S.2d 910, 912 (N.Y. App. Div. 1993) (1842 Treaty "clearly refers only to taxes levied upon real property or land"), aff'd, 84 N.Y.2d 941 (N.Y. 1994)). In the Perkinses' parallel District Court case, after questioning the precedential import of Kaid,[10] Judge Vilardo found it also lacked persuasive value because Kaid dealt with products unrelated to Seneca land and the parties in Kaid were not Indians. Perkins, 2017 WL 3326818, at *5 ("[T]here is no reason to believe that the [Second Circuit] even thought about taxing the products of the real property"). Indeed, the District Court

---

[9] The 1842 Treaty ceded back to the Seneca Nation land it had previously sold to the Ogden Company, including the Allegany Territory. See 1842 Treaty, art. 1, 7 Stat. at 587; Hauptman, supra, at 107.

[10] Because Kaid is a summary order published in the Federal Appendix, Judge Vilardo remarked that it's not precedential in the Second Circuit. Perkins, 2017 WL 3326818, at *4 (citing 2d Cir. R. 32.1.1(a) (citation of summary orders)). We are nonetheless persuaded by the Second Circuit's reading of the 1842 Treaty.

questioned whether real property "can even be distinguished from the dirt, gravel, and foliage that comprise it." Id. We, on the other hand, are persuaded by the Second Circuit's reading of the 1842 Treaty, and we don't find it difficult to distinguish real property from the gravel severed from it. Black's Law Dictionary 1412 (10th ed. 2014) defines real property as "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land." The gravel wasn't attached to the land when it was sold, so the Perkinses aren't exempt from tax on the sale of the gravel under the 1842 Treaty. Cf. In re Briggs Ave. in New York, 89 N.E. 814, 816 (N.Y. 1909) (a building that is severed from real property becomes personal property).

That leaves the issue of penalties. The Commissioner asserted two: a failure-to-timely-file penalty under section 6651(a)(1) and an accuracy-related penalty under section 6662(a).

Section 6651(a)(1) adds 5% per month (up to a maximum of 25%) to the tax already owed for failure to file a return on time. The Commissioner has produced the Perkinses' 2008 and 2009 returns to show that they were filed late, so he has met his burden of production. See sec. 7491(c). The Perkinses' 2008 tax return was due in October 2009 and their 2009 return was due in October 2010. They didn't file either until October 2011. The Perkinses also didn't address penalties

in their brief, so we deem this issue conceded for that reason as well. See Rule

151(e), Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Tufft v.

Commissioner, T.C. Memo. 2009-59.

The Commissioner also determined that the Perkinses are liable for

accuracy-related penalties under section 6662(a). Section 6662(a) penalizes a

taxpayer on the portion of the underpayment of tax attributable to any substantial

understatement of income tax. Sec. 6662(a), (b)(2). The Commissioner also has

the burden of production here. Sec. 7491(c). An understatement is substantial if it

exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the

return." Sec. 6662(d)(1)(A). The Perkinses' true tax liability for 2008 is just shy

of $200,000, but they initially didn't report any taxable income. For 2009 their

correct tax liability is just over $200,000 but, as for 2008, they originally didn't

report any taxable income. These understatements are of course greater than 10%

of the tax the Perkinses should have reported, which is greater than $5,000.

This would ordinarily be enough for us to hold that the Commissioner has

met his burden of production on the section 6662 penalty. The Second Circuit,

however, recently held in Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir.

2017), aff'g in part, rev'g in part T.C. Memo. 2015-42, that section 6751(b)(1)

"requires written approval of the initial penalty determination no later than the

date the IRS issues the notice of deficiency * * * asserting such penalty." It also held that "compliance with § 6751(b) is part of the Commissioner's burden of production and proof in a deficiency case in which a penalty is asserted." Id. The Commissioner has not met even his burden of production on the section 6662 penalty here, and so we cannot find that he has established his entitlement to judgment as a matter of law on this penalty, even though the Perkinses didn't make any arguments about the penalty in their brief.[11]

An appropriate order will be issued.

Reviewed by the Court.

VASQUEZ, MORRISON, BUCH, and NEGA, JJ., agree with this opinion of the Court.

---

[11] The Perkinses also filed a motion for leave to file supplemental materials, which we will grant. We considered the supplemental material in this Opinion.

LAUBER and PUGH, JJ., concurring in part and concurring in the result: We agree with the opinion of the Court that the Canandaigua Treaty, Nov. 11, 1794, 7 Stat. 44, does not exempt from Federal income tax the revenues of petitioners' gravel mining business. The opinion of the Court reaches the same conclusion with respect to the Treaty with the Seneca, May 10, 1842 (1842 Treaty), 7 Stat. 586, reasoning that it exempts from tax only "the lands of the Seneca" and that the gravel petitioners mined is distinct from those lands. But as Judge Foley convincingly shows in his dissenting opinion, there are unresolved factual and legal issues as to whether gravel mined from Indian land is part of Indian land. Although summary judgment on that theory is inappropriate for that reason, we would sustain summary judgment for respondent on two alternative grounds: first, that the 1842 Treaty, like the Canandaigua treaty, did not confer rights on individual members of the Seneca Nation, and second, that the 1842 Treaty addresses exemption only from State, not Federal, taxes.

The opinion of the Court correctly notes that we should interpret the 1842 Treaty as the Seneca understood it. Doing so requires understanding the historical background of the 1842 Treaty and analyzing the language the parties employed. See Choctaw Nation of Indians v. United States, 318 U.S. 423, 432 (1943). The 1842 Treaty had a very narrow purpose, namely, to resolve disagreements that had

arisen under a treaty the United States had signed with the Seneca four years previously.  See Treaty at Buffalo Creek of 1838, 7 Stat. 550 (1838 Treaty).  When the text of the 1842 Treaty is read against this historical background, it is clear that the 1842 Treaty conferred rights on the Seneca Nation, not its constituent members, and that it covers only taxes imposed by the State of New York.

The land on which petitioners conducted their gravel mining business is within the Seneca reservation.  Before 1838, the Seneca lived on four distinct reservations in upstate New York:  the Buffalo Creek, Cattaraugus, Allegany, and Tonnewanda reservations.  In 1838 the Seneca sold all four reservations to a pair of private businessmen, Thomas Ogden and Joseph Fellows, for $202,000.  In the 1838 Treaty, executed concurrently with the deed of sale,[1] it was agreed that the Seneca would move west of the Mississippi River by April 4, 1845, but that they could remain on the Allegany and Cattaraugus reservations until that date.  1838 Treaty, arts. 2, 3, 10, 7 Stat. 550, 551-553.

In 1840 the New York Legislature imposed a highway tax, and in 1841 it imposed a road tax, on the land (then owned by Ogden and Fellows) that had constituted the Allegany and Cattaraugus reservations.  Act of May 9, 1840, 63d sess.,

---

[1]The 1838 treaty was signed on January 15, 1838, but was not proclaimed until April 4, 1840.

ch. 254, secs. 1 and 2; Act of May 4, 1841, 64th sess., ch. 166, secs. 1, 3. If either tax went unpaid, the State could impose liens and seize land on which the Seneca were then residing and on which they had the right to reside until 1845. The taxes and the enforcement mechanism were controversial, resulting in a lawsuit that eventually found its way to the U.S. Supreme Court. See In re New York Indians, 72 U.S. (5 Wall.) 761, 763-764, 771-772 (1866).

Numerous disagreements on this and other points arose concerning the proper interpretation of the 1838 Treaty. The 1842 Treaty, which essentially replaced the 1838 Treaty, was intended to "settle, compromise, and finally terminate" these "divers questions and differences." 1842 Treaty, 7 Stat. at 587 (fifth "whereas" clause). Under the 1842 Treaty, Ogden and Fellows retained ownership of the land that formerly constituted the Buffalo Creek and Tonnewanda reservations. The Seneca were restored to ownership of the Allegany and Cattaraugus reservations, but the Treaty vested in Ogden and Fellows the right to purchase the land comprising those two reservations when the Seneca moved west. Id. art. 1. And in lieu of the purchase price stipulated in the 1838 Treaty, the 1842 Treaty provided that the Seneca would ultimately be paid, for release of the Buffalo Creek and Tonnewanda reservations, "a just consideration sum" to be determined by a panel of arbitrators. Id. arts. 3 and 4, 7 Stat. at 588.

Article 9 of the 1842 Treaty is the provision that concerns us here. When quoting this provision, see op. Ct. p. 17, the opinion of the Court omits the first 18 words, which are quite significant in our view. Article 9 in its entirety reads as follows:

> The parties to this compact mutually agree to solicit the influence of the Government of the United States to protect such of the lands of the Seneca Indians, within the State of New York, as may from time to time remain in their possession from all taxes, and assessments for roads, highways, or any other purpose until such lands shall be sold and conveyed by the said Indians, and the possession thereof shall have been relinquished by them. [Id., 7 Stat. at 590.]

When this language is read against the historical context, it seems clear that the 1842 Treaty, like the Canandaigua treaty, did not create a tax exemption for individual members of the Seneca Nation. See In re New York Indians, 72 U.S. at 771-772. Rather, the parties agreed that the remaining tribal lands--i.e., the lands comprising the Allegany and Cattaraugus reservations--would be protected only as long as those lands remained in the Seneca's possession. There is no dispute that the Perkinses mined and sold the gravel to generate income for themselves, not for the Seneca Nation. The 1842 Treaty, then, has no application to this case.

It also seems clear that the "taxes" to which the 1842 Treaty refers are taxes imposed by the State of New York. As the opinion of the Court correctly notes,

article 9 has always been interpreted to refer "only to taxes levied upon real property or land." See op. Ct. p. 18 (quoting Snyder v. Wetzler, 603 N.Y.S.2d 910, 912 (N.Y. App. Div. 1993), aff'd, 84 N.Y.2d 941 (1994)). In 1842 there was no Federal tax on real property or land. Indeed, no Federal tax on land had existed during the previous 26 years.[2]

Given the extremely narrow focus of the 1842 Treaty--to settle disputes that had arisen about interpretation of the 1838 Treaty--it seems highly unlikely that the parties intended article 9 to confer immunity from a Federal tax that did not then exist and had not existed for a generation. Indeed, article 9 is limited to the lands of the Seneca Indians "within the State of New York." All parties to the 1842 Treaty expected that the Seneca would eventually move west of the Mississippi River. If the Seneca had been concerned about the possible future appearance of a Federal property tax, they presumably would not have agreed to limit the Federal exemption to property within New York.

---

[2]The Fifth Congress enacted the first direct tax on land in the fixed amount of $2 million. Act of July 9, 1798, 1 Stat. 597. The Jefferson administration declined to renew the tax (and also repealed contemporaneously enacted excise taxes). See Act of Apr. 6, 1802, 2 Stat. 148. Other Federal taxes on land, generally imposed in a fixed amount on a one-time basis, were enacted in 1813, 1815, and 1816, but then disappeared until the Civil War. Act of Aug. 2, 1813, 3 Stat. 53; Act of Jan. 9, 1815, 3 Stat. 164; Act of Mar. 5, 1816, 3 Stat 255. See generally Veazie Bank v. Fenno, 75 U.S. (8 Wall.) 533, 542-543 (1869).

The type of taxes to which article 9 refers is also instructive. It refers to "assessments for roads, highways, or any other purpose" levied on land that "may from time to time remain in * * * [the Seneca Nation's] possession * * * until such lands shall be sold and conveyed by the said Indians." Under the 1842 Treaty, the land that was to remain in the Seneca's possession consisted of the Allegany and Cattaraugus reservations, which were the target of the objectionable highway tax and road tax--i.e., "assessments for roads * * * [or] highways"--that the New York Legislature had enacted in 1840 and 1841. Given this historical context, article 9 seems clearly designed to protect the Allegany and Cattaraugus reservations from New York taxes until the Seneca sold the land and moved west.

Perhaps most instructive are the introductory words of article 9, whereby "[t]he parties * * * mutually agree to solicit the influence of the Government of the United States to protect * * * the lands of the Seneca Indians" from taxation. This would be an extremely odd--we would guess unprecedented--way to express an exemption from Federal taxation. To start with, a sovereign Government cannot "influence" itself. If the United States had intended to confer immunity from Federal taxation in article 9, it would presumably just have said so. And if the Seneca had bargained for immunity from Federal taxation, they presumably would

have demanded an explicit statement to that effect, which the United States (had it intended to grant such an exemption) could easily have supplied.

The natural interpretation of these introductory words is that the United States would exercise its influence to prevent New York from taxing the Seneca's land, as the New York Legislature had sought to do in 1840 and 1841. The State of New York was not a party to the 1842 Treaty, and principles of sovereign immunity would have prevented the United States from attempting to interfere with an otherwise-constitutional New York tax.[3] The best the United States could do was to pledge to use its influence to dissuade New York from taxing Seneca reservation land while the Seneca continued to occupy it. This campaign apparently succeeded: In 1857 New York abolished the 1840 highway tax and the 1841 road tax. See In re New York Indians, 72 U.S. at 771.

For these reasons, we conclude that article 9 of the 1842 Treaty does not confer immunity from Federal taxation and does not even address that subject. Like the rest of the 1842 Treaty, article 9 was intended to address one of the "divers questions and differences" that had arisen in the wake of the 1838 Treaty--

-----

[3]See Dobbins v. Comm'rs of Erie Cty., 41 U.S. (16 Pet.) 435, 447 (1842) (State taxing power "is a sacred right, essential to the existence of government--an incident of sovereignty"); M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 436-437 (1819) (distinguishing State taxes assessed on a Federal instrumentality's land from State taxes imposed on its constitutionally authorized operations).

namely, New York's attempt to impose road and highway taxes on the land comprising the Allegany and Cattaraugus reservations, ownership of which the 1842 Treaty revested in the Seneca. In article 9 the United States agreed to use its influence to prevent New York from taxing the land within those two reservations so long as the Seneca continued to occupy that land. That article accordingly has no application to Federal taxation.

Unlike the opinion of the Court, we would not reach the issue of whether gravel constitutes real property. Instead, we would grant summary judgment for respondent because article 9 of the 1842 Treaty conferred rights on the Seneca Nation, not its constituent members, and because immunity from Federal taxation was not among the rights conferred.

MARVEL, GALE, THORNTON, GOEKE, GUSTAFSON, PARIS, KERRIGAN, and ASHFORD, JJ., agree with this opinion concurring in part and concurring in the result.

FOLEY, J., dissenting: The Treaty with the Seneca, May 20, 1842, 7 Stat. 586 (1842 Treaty) states that the United States will "protect such of the lands of the Seneca Indians, within the State of New York, as may from time to time remain in their possession from all taxes". 1842 Treaty, art. 9, 7 Stat. at 590 (emphasis added). When determining whether summary judgment is appropriate, we must view all facts in the light most favorable to the Perkinses (i.e., the nonmoving party). See Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). In addition, "treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit". County of Oneida v. Oneida Indian Nation of N.Y., 470 U.S. 226, 247 (1985) (internal citations omitted). The opinion of the Court, however, construes the treaty narrowly rather than liberally and cites United States v. Kaid, 241 F. App'x 747, 750 (2d Cir. 2007), an irrelevant nonprecedential summary order, and Black's Law Dictionary as its only authorities.

The opinion of the Court concludes that gravel mined from Indian land is not part of Indian land, reasoning that "[t]he gravel wasn't attached to the land when it was sold, so the Perkinses aren't exempt from tax on the sale of the gravel under the 1842 Treaty." See op. Ct. p. 18. More convincingly, the United States District Court for the Western District of New York stated that

> [g]iven the liberal principles of treaty construction that apply here, there is no reason to believe that one rule would apply to taxing the dirt, gravel, and foliage that make up the property and another to the property itself--if "the property" can even be distinguished from the dirt, gravel, and foliage that comprise it.

Perkins v. United States, No. 16-CV-495(LJV), 2017 WL 3326818, at *5 (W.D.N.Y. Aug. 4, 2017). The opinion of the Court's conclusion, see op. Ct. p. 18, that it is not "difficult to distinguish real property from the gravel severed from it" ignores the complexities relating to mineral rights and property law. See Watt v. W. Nuclear, Inc., 462 U.S. 36, 55 (1983) (holding that in the context of the Stock-Raising Homestead Act of 1916 (SRHA) (since repealed), "valuable minerals" include gravel); Tyonek Native Corp. v. Cook Inlet Region, Inc., 853 F.2d 727, 729 (9th Cir. 1988) (analyzing the subsurface and surface ownership rights of sand and gravel); Res. Conservation Grp., LLC v. United States, 96 Fed. Cl. 457, 465 (2011) (holding the Navy correctly determined that embedded gravel and sand were real property pursuant to 41 C.F.R. sec. 102-71.20); cf. BedRoc Ltd., LLC v. United States, 541 U.S. 176, 185-186 (2004) (declining to extend W. Nuclear, Inc., 462 U.S. at 36, and holding that sand and gravel were not considered "valuable minerals" pursuant to the Pittman Underground Water Act of 1919). Simply put, the opinion of the Court fails to address the requisite legal and factual issues. Thus, the grant of summary judgment is not appropriate.